THE MARINE BANK OF CHICAGO, Appellant, *v.* CHAS. CHANDLER, Appellee.

### APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

Where it appears that a bank received for a customer by collecting or by receipt of deposits, funds, which were current, and passed as money in general business transactions, without directions to hold the identical funds, it will have to account to the owner for the sums so received, without diminution or discount, notwithstanding the bills received by the bank were at the time or have since depreciated in value.

The special custom of bankers in a particular locality, cannot change values as fixed by law; and if some persons have been in the habit of receiving depreciated paper in payment of dues, the right to enforce payments in such paper does not exist. Such a right can only arise by contract.

A general agreement to receive depreciated paper in business transactions, may be abandoned by common consent, and when this appears, a party who disregards such agreement cannot hold another to it.

THIS was an action of assumpsit for money had and received, money lent, money due upon account stated, and money paid, etc., commenced in the Superior Court of Chicago, to the July term thereof, 1861, by defendant in error, against the appellants, for damages laid at $20,000.

The declaration is in the usual form, containing only the money counts, attached to which is a copy of the account upon which the suit is brought, and is for an alleged deposit of $20,000—by the defendant in appeal, with the plaintiffs as bankers.

Defendants below filed the plea of the general issue, and the trial took place before the court and a jury.

The trial took place at the November term of said court, A. D. 1861, when the jury rendered a verdict for the plaintiff below, and assessed the damages at the sum of $16,375.83.

Whereupon, defendants moved for a new trial, which was overruled by the court.

The court entered a judgment upon the verdict.

Thereupon, defendants prayed the appeal herein taken, to the Supreme Court, which was allowed.

The substance of the testimony of Lewis C. Ellsworth, and that of Mr. Dox, the cashier of the Marine Bank, is given.

*Mr. Ellsworth* says: " I am a banker of the firm of H. A. Tucker & Co., and one of the partners of said firm. I have been engaged in the business of banking in Chicago for several years past."

Plaintiff's counsel here showed the witness a draft, of which the following is a copy :

WISCONSIN FIRE AND MARINE INSURANCE COMPANY'S BANK,

$957.                                      *Milwaukee, April* 11*th*, 1861.

At sight of this first of exchange, (second unpaid,) pay to the order of Jacob L. Platner, nine hundred and fifty-seven dollars, in current Bk. notes, on account of this Bank.                    (Signed)

To MESSRS. H. A. TUCKER & CO., }           D. FERGUSON,
       *Chicago, Ill.*  }                         Cashier.

On the back of which draft are the following indorsements: " Jacob J. Platner," " Jacob Strader," " Pay to Marine Bank, Chicago. Charles Chandler & Co., per J. B. Pearson."

"This draft was paid by H. A. Tucker & Co., to defendant, on the 19th of April last.

"I have personal knowledge of the payment of the draft on 19th of April. The draft was paid in the daily exchange between the two banks. It was paid in Illinois currency, which at that time was current bank notes of Illinois banks, organized under the laws of the State. The exchanges at that time, of the banks with each other, were made in bills of the Illinois banks. The exchanges were made every day, by the defendant sending in all checks and drafts against H. A. Tucker & Co., and H. A. Tucker & Co. would make up their account of all checks and drafts against defendant, and the difference, if any existed in favor of either, was paid in Illinois bank notes. The bills of all the banks in the State were then current, except nine banks discredited or thrown out in November previously (1860), and thirty banks thrown out and discredited on the 30th of March, 1861, and these notes had ceased to pass current. After these banks had ceased to be current, the bills of all the other banks were the currency in circulation in April, 1861. These bills or notes were used at this time in all the transactions of business, and were such as paid debts to H. A. Tucker & Co., and were received by others in payment of debts. In April and May the entire circulation was made up of Illinois banks. On the 19th of April, 1861, there was a difference between the value in market of these bills and coin. It is my impression that coin was worth ten or fifteen per cent. in these bills. Nominally it was ten, but really it was fifteen per cent. I think it cost that to convert the bills into coin. The bills of these banks continued to circulate as money until the 18th of May, 1861, and down to that day almost the entire circulation was made up of these notes. These notes or bills continued to decrease in value from the 19th of April to the 18th of May, 1861.

"I have been about ten years engaged in the banking business in Chicago, as paying and receiving teller most of the time. It is the general usage and custom of banks, to keep

their customers' money or funds in one common, not separate, fund. This is the custom of all banks here, and has been. Everything received in the ordinary course of business is put into one common fund.

"I have been in the State since the free banking has been in force, and been engaged as a banker during the last ten years. The bills of these banks have made up the principal part of the circulation here. There were some Wisconsin bills circulated here. The bills of Eastern banks and coin have always been treated by bankers as worth more than our bills, the difference being from one to forty and fifty per cent., down to the 18th of May last. The bills which have been in common use here, buying goods and paying debts, have been bills of Illinois banks.

"If a deposit was made in Eastern bills or bank funds of Eastern banks, or in gold, and no premium was paid to the depositor, it was the custom of the bankers to credit coin or Eastern funds as such, and if the party wished to draw for coin or Eastern funds, it was specially called for in the checks. He drew out like funds to those deposited, if he was paid no premium to reduce the deposit to currency, the same as other funds in general circulation.

"I resided here in June last, and was engaged in the banking business; had means of knowing the value of Illinois bank notes at that time. The average value of all the bills of all the banks which were in circulation after the 1st of April, 1861, was, on 21st of June, 55 to 60 cents on a dollar. On the 18th of May, the Illinois banks ceased to circulate as money, and became the subject of barter as a commodity, and so continued to the present time. I include, in making this average, the entire body of bills, good, bad and indifferent, which were in circulation. In the spring of 1861, the currency was composed of the poorer class of the banks. The bills of the same banks which were in circulation in April and May, 1861, were in circulation in 1860, except those rejected in November and March previously.

"Currency depreciated from the 20th of April till the time it went out of circulation, and till the 1st of June. In April and May the depreciation was from ten to twenty per cent., compared with coin, and in June the depreciation was from ten to sixty per cent. The bills of no bank, except the Marine Bank, were in circulation at par in June. The bills which were in circulation in the winter of 1860, and spring of 1861, were the same that were in circulation in April and May, and they were used previous to the 18th of May in the payment of debts and in business as money. They com-

posed the currency almost exclusively at that time; they were received on deposit.

"Where a deposit was made, generally, it was credited as currency; if in coin or Eastern currency, it was so noted. Where a check was drawn, payable generally, it was paid in Illinois bank bills. Up to the time when bills were thrown out in November and April, the bills of those banks had circulated as money after the rejected bills had ceased to circulate as money. Illinois bank bills have constituted the principal part of the currency for some nine or ten years. I think those bills have been as near par, from time to time, as one-half per cent. since the passage of the law. In November, the banks here had on deposit and in their vaults, the bills of the banks which were then rejected.

"When the thirty banks were thrown out in March, the banks here had the bills of those banks on deposit right with the common fund of their depositors, but they did not undertake to pay them out on the checks of their depositors. The banks entered into an agreement not to pay out the bills of those banks on account of their depreciation. They ceased to be current after the banks here rejected them, but they were current to the time of rejection.

"For one or two years there was a large amount of Georgia bank bills in circulation. The issues of the Wisconsin banks have constituted a part of the circulation during the last ten years, sometimes for some months quite a large amount of them. The bank notes of the Bank of Iowa constituted a very small portion of the circulation previous to the 19th of April. Some of those notes, and also of banks of Kentucky, Ohio and Indiana, also constituted a part of the circulation in April last and previously. When I speak of Eastern currency, I mean New York and the New England States. There were also some bills of Michigan and Pennsylvania in circulation. The notes of Indiana, Pennsylvania, Ohio, Michigan and Kentucky have always been considered as worth more than our circulation. When those notes were intermixed with their deposit, it was customary to credit a premium. Georgia bank notes passed as currency never at a premium, although the most of it was readily convertible. During April and May last, there was $30,000 or $40,000 of Georgia currency in circulation.

"It is the custom of country bankers to keep accounts with bankers here. The course of business between them consists in the country bankers sending checks and drafts on other banks and business houses, together with currency at times, which are placed to their credit, and drawn against by them

as they might need, and it has been customary for merchants and produce men generally to place money to the credit of country banks with whom they were dealing at the time. No charge is made either way by the bankers here or there for the receiving or having the money thus deposited. The arrangement is an accommodation for the country banker in having his money here so that he can draw drafts to parties with whom he deals, so as to avoid the risk of sending money here. The city banker has usually a balance to the credit of the country bankers, which may be an advantage. Whatever is thus placed to the credit of the country banker, he can draw against it. The banker here uses the money thus placed to his credit in the same way as money deposited with it by its other customers. As a general thing, a deposit account is desirable to the banks. Banks make money out of the buying and selling of exchange, and discounting business paper for business men here; the larger the amount of the deposit the more it can do. The larger the general balance on hand is, gives the bank so much more that they can use in discounts and exchanges. From the month of November to the 18th of May, the fluctuation in the discount on circulation for gold was from two to twenty per cent., varying from time to time between these extremes.

"After the bills were rejected in November and April, the bills in the hands of the banks here were sorted out by them and laid away. They were not attempted to be paid out by the banks. The bills, after rejection, were put away as so much dead money. In 1853 and 1854, and perhaps 1855, the bills of the Georgia banks disappeared from circulation, mostly. In the spring of 1861, the bills of Iowa constituted no perceptible part of the circulation. The bills of free banks were more in circulation at that time than the bills of State banks. Our banks were receiving and paying out $75,000 to $100,000 per day. It was very rarely that we saw anything else in circulation than Illinois and Wisconsin bank notes. There was not much difference in the value of the two. Sometime in April, Wisconsin bills ceased to circulate here. After April 1st, the circulation was almost entirely Illinois bills.

"The bank notes thrown out in November and March were assorted by the banks from among their deposits and laid away as dead. And the same was the case with the bills of the residue of the Illinois banks after the 18th of May. They likewise then became dead, and were thereafter bought and sold as a commodity by brokers."

The defense, by agreement with plaintiff, stated that the balance due upon the accounts between the parties, was the sum

of $15,971.23, as appeared from the book of defendant, some payments having been made since the presentation of the plaintiff's check on the 21st of June, on checks which he had before drawn, but which had not then been presented.

The defendant then offered in evidence an agreement signed by the plaintiff, of which the following is a copy:

No. 1.

### CHICAGO MARINE AND FIRE INSURANCE COMPANY.

The undersigned agree to receive and pay out as currency, in payment of debts, and general transactions of business, during the present war, the notes of all the banks of this State at present taken by the following named banks and bankers of Chicago, provided the bankers named below agree to do the same.

> CHICAGO MARINE AND FIRE INSURANCE COMPANY.
> B. F. CARVER & CO.
> F. GRANGER ADAMS.
> HOFFMAN & GELPCKE.
> H. A. TUCKER & CO.
> WESTERN MARINE AND FIRE INSURANCE COMPANY.
> EDWARD I. TINKHAM & CO.

This agreement to be terminated upon the transfer of our account with the Chicago Marine and Fire Insurance Company.

> CHARLES CHANDLER & CO.

HAM. B. DOX.

The defendant also offered in evidence an agreement, of which the following is a copy:

No. 2.

*Chicago, April 26th, 1861.*

We, the undersigned citizens and business men of Chicago, agree to receive and pay out as currency, in payment of debts, and general transactions of business, during the present war, the notes of all banks of this State at present taken by the following named banks and bankers of this city, provided the bankers named below agree to do the same:

> Chicago Marine and Fire Insurance Company.
> B. F. Carver & Co.
> F. Granger Adams.
> H. A. Tucker & Co.
> Western Marine and Fire Insurance Company.
> Hoffman & Gelpcke.
> Edward I. Tinkham & Co.

In accordance with the above, we the undersigned bankers do hereby ratify and confirm the agreement therein expressed.

> J. YOUNG SCAMMON,
> *President of Chicago Marine and Fire Insurance Company.*
> H. A. TUCKER & CO.
> F. G. ADAMS.
> B. F. CARVER & CO.
> HOFFMAN & GELPCKE.
> EDWARD I. TINKHAM & CO.
> J. H. WOODWORTH, *Pres't.*

*H. B. Dox* testified as follows : " I am cashier of the Marine Bank."

Witness is told to look at agreement numbered " 2," a copy of which is given above, and states : " The first signature to the said agreement is that of J. Y. Scammon. He was president of the Chicago Marine and Fire Insurance Company. This is his signature attached to the agreement." Witness proves the signatures of all the parties.

" My name is signed to the paper No. 1 as secretary. This paper was signed about the 27th of April. The agreement was sent to plaintiff about the 29th of April, to be signed by him. We sent with it a circular that we would not receive this kind of currency on deposit unless he signed the agreement. The circular was attached on the other half of the same sheet upon which the agreement was printed, so that he could separate the circular from the agreement, and enclose us the agreement signed by him. The circular also notified him that the business would not be continued unless he signed it. This is a copy of the circular enclosed with the agreement :

No. 3.

CHICAGO MARINE AND FIRE INSURANCE COMPANY.

CHICAGO, April 27th, 1861.

*Dear Sir :*—I inclose a copy of an agreement entered into by the bankers and business men of Chicago, for your signature, should you be disposed to co-operate with us. Our board of directors have ordered that no deposits of money be received, or open accounts kept, with parties who do not assent to this agreement. Should it be declined, please direct a transfer of your account, collections, etc. I also inclose a list of the names of parties who have to-day deposited under this agreement.

Yours respectfully,        HAMILTON B. DOX, *Sec'y.*

" I can't say when I first saw the agreement signed by plaintiff, after it was returned, or after he had signed it."

(Defendant read in evidence the two papers above, numbered one and two.)

Witness adds : " The circular sent to plaintiff was on the other half of the sheet on which an agreement to be signed by plaintiff was contained. This is the circular (looking at the paper numbered 3, already referred to above,) which was sent to the plaintiff. Our correspondents to whom the circulars were sent, tore off the part to be signed by them, and returned only that part with their signature thereon, keeping the other part. [Defendant then read the circular, in evidence.] Chandler & Co. never had any business with defendants before the month of April last. The account was opened on the 18th of April, 1861. At that time the currency

was in a disturbed and unsettled state here. I don't think it ceased before the 18th of May last, at which time the whole currency broke down and ceased to circulate as money.

" I have seen the evidence of debt introduced. The defendant received for plaintiff the same kind of currency it received on its own claims. We received Illinois currency in payment of debts due the bank during the same time plaintiff's account continued, and the same kind of currency that we received was that which was, in general, in use among banks and business men, and by the great bulk of business community. The currency was then composed of Illinois bank bills.

" After the thirty banks were thrown out, the nominal amount of Illinois banks in circulation, was $6,500,000. I arrive at this from the State Auditor's reports. I speak from public rumor. The bills of the thirty banks which were discredited in March, and which defendant had on hand, were not mixed with its other funds, but were separated therefrom, and kept separately. They were not, after thrown out, paid or offered to depositors on their checks. I have been engaged as a banker seven years. The usage and custom of bankers is to intermix all the moneys collected for its customers as well as those kept on deposit. They were not kept separately. The funds which were received on collections made for plaintiff, went into the common funds of the bank. The funds with which plaintiff's funds were intermixed, were composed of Illinois bank notes. They were made up of such bank notes as had been in general circulation in the spring of 1861, except discredited notes. They were the same kind that we received for our debts, and paid debts with, and were received by others for the same purpose.

" The rate of discount for specie on the currency received from plaintiff was as follows, at the rates specified : " April 16th, rate of discount 8 per cent.; 17th, rate of discount 10 per cent.; 20th, rate of discount 10 per cent.; 22nd, sold very sparingly at 12 per cent. discount; 24th, not freely at 15 per cent. discount; 29th, sold sparingly at 10 per cent. discount; May 1st, 10 per cent. discount; 4th, 10 per cent. discount; 6th, 10 per cent. discount; 8th, 10 per cent. discount; 9th, 10 per cent. discount; 10th, no sales, 10 per cent. discount; 13th, but little sold, 10 per cent. discount; 15th, $1,500 sold at 10 per cent. discount; 17th, for what was sold, 25 per cent. discount; 18th, 25 per cent. discount. After that, no rate; the currency ceased to circulate as money, and was no longer used as such. Exchange was readily sold, on 16th April, at the rate named; after the 20th April, it was sold sparingly; after the 18th of May, and down to the 21st of June, it had no value

except for sale to brokers, who bought it up for the purpose of converting the same and obtaining the bonds of the banks from the State Auditor. The average price for purposes of sale, from the 18th of May to time of demand in this case, (21st June,) I should say, was between fifty and sixty cents. During that time, and since then, there was no such thing in circulation, as currency, as the bills of Illinois banks. The great body of it has risen in value since that date. The rise in Southern stocks has caused this. Since the 18th of May, the bills fluctuated in value as the stocks on which they were based fluctuated. After the 18th of May, there was nothing in use which had been used as currency before. These drafts have been paid by the defendant. [It was here admitted that all the plaintiff's drafts have been paid.] They were all paid out of the common fund of the bank, which consisted of like funds with those which have been described. No objection was ever made to such payment by plaintiff. There would be no profit from an account with an interior bank unless the balance is large. It would be no advantage to a bank unless they helped to create that balance.

"In April and May last, the bankers were averse to taking a new account, on account of the state of the currency exposing the bank to additional risk, and the feeling in the business community was such at that time that these funds could not be employed in the transaction of business. The course of these funds was into the banks. The funds could not, at that time, have been employed in the business of the bank to only a limited extent. They could not be employed in the purchase of exchange, and in loaning on securities to a limited extent. Two of the banks thrown out in April were restored to circulation, and were treated as currency. My estimate of the average value of Illinois bills, in June, does not include the bills of the banks which had been discredited before the first of April. Our charge for sterling bills was $5 per pound, and the fifteen cents was the difference in bank bills and specie; but I will not speak positively on this point. The defendant, at the time of plaintiff's demand in June, offered to pay its debts in the bills which were current in April and May. The bills of the discredited banks were kept in a separate place, and not mixed up with the funds of the bank.

"I have no knowledge, except from bank books, that plaintiff was not a customer till April last. I have not seen his name on the books. There is no profit from collections unless there is a reliable average balance all the time with the bank. It is customary for the banks to use a certain part of the average surplus of deposits in its general business in buying

exchange and in loaning money, and advancing to its customers on securities.

"After this agreement was signed, the bankers signing it received and paid out the money described in it in payment of debts, and in the general transaction of business, till the circulation broke down after May 18th. After that time I don't recollect an instance in which Marine and Fire Insurance Company or defendant received those bills in the payment of debts or in the general transaction of business. If deposited, they were only taken by them as special deposits. At that time both institutions had a large amount of bills receivable ($800,000 or $900,000), which had mostly matured before. A small part matured after the 18th of May, perhaps from one-eighth to one-fourth of the whole amount after the 18th of May. I think none of the bankers named in the list continued to take any of these bills. They were alike refused by all as currency. I was cashier of the Marine Bank of Chicago, and secretary of the Marine and Fire Insurance Company. Scammon was president of both. The same officer was paying teller and receiving teller, and assistant cashier of both; the paying teller and receiving teller acted for both; both had same persons as directors, and stockholders had same interest in both. They held equal shares in both; no one could have stock in one and not in the other. The certificate of stock is a joint certificate in both. There were no separate shares in either. The stock shows on its face that the share is in both, and that a transfer of it transferred a share in each. Everything that was done was known to the officers of both institutions.

"There was a meeting of the bankers at the defendant's office, preliminary to the making of the agreement signed by them. This meeting was held on the 26th of April. Three officers of defendant were present thereat, the vice-president and myself. Scammon at that time was in Springfield. At the time this circular was inclosed to the plaintiff, Scammon was not here. We had such a large amount of Illinois bills we had to keep a police officer. The risk was also on account of the depreciation, and thereby raising a question with depositors as to the extent of the liability of the bank. Plaintiff's deposits went into the common deposits of the bank. No attempt to keep them separate was made, or ever is made, in such cases. I think plaintiff was there seeking a settlement of his account. Before the demand was made by him, he was trying to effect a settlement of his account. The paying teller, at the time of demand, had an assortment of the different grades of bills with which to pay depositors. The better grades in April and May were assorted and held by the cashier

to keep. That which was paid out was, during those months, the worst. This assorting took place every day, and the best separated and put away. The better grades were thus reserved; the worst grades were put into paying teller's hands to pay out. After the 18th of May, we would take out of that fund to put with and pay out to depositors. The checks on defendant and Marine and Fire Insurance Company were paid out of the same fund. Checks on the defendant were always paid by the Insurance Company. The funds in the hands of the teller, on the 21st of June, to pay checks with, were not so good as those in the hands of the cashier. The reserved fund was the best.

" The cashier had all kinds to pay with, while the reserved was the best. The teller had in his hands on that day between $100,000 and $200,000. The assorting teller had $600,000 to $800,000, and the reserved fund contained $300,000 to $400,000. The assorting was made immediately after the 18th of May, and was completed about that time. The reserved fund was the best, but as the assorting teller had some of the higher grades, the paying teller would go to the assorting teller. On the 21st of June, the paying teller had in his hands more than an average in value of all the bills of what were actively in circulation in April and May. On the 21st of June the paying teller had not in his hands of an average of all the bills then on deposit in the bank; his assortment was much below the average. The instructions to the teller were made to pay plaintiff's checks in the lower grades of currency, because his deposits were made when we were receiving only the lower grades. During the seven years last past, the word *currency* meant, among bankers, such bank notes as passed current among bankers and business men. Currency, bankable funds, and current bank notes, have meant, and mean, the same thing among them. Since 1856, the currency has been composed almost exclusively of Illinois bank notes, with some Wisconsin. There was some Iowa in circulation, passing in small lots. There was also some of Kentucky, passing in same way. Currency, bankable funds, and current bank notes, mean the same thing; that is to say, the bank notes which pass current as money. The word has always been used in the same sense through all varying circumstances, and means the paper circulation passing as money. It has always been at a discount for coin, and is still. Par currency here means just the same as currency. Par funds means the same thing as currency. If demand is made in currency worth one hundred cents on the dollar, I should think it would be pay-

able in currency. The currency passes at one hundred cents on the dollar, and ordinarily means a dollar. The teller was not authorized to pay the plaintiff in anything but an average of the lower grades then in the bank. The state of mind referred to by me in the business community, was in reference to the circulation of these bills, which prevented bankers from issuing these deposits in their business to anything like the usual extent. There had been an uneasy feeling in regard to it all the previous winter, but it became still more marked and apparent after the 10th of April.

" The first disturbance in the currency began in November last, from the 16th to the 20th. Nine banks were thrown out after the 16th of November. Those were almost exclusively based upon the stocks of the Southern States; no material amount of Northern stocks. After that there continued to be an uneasy feeling in reference to those which were based on same stocks. The confidence, or want of confidence, in the bills, was governed by the price of stocks in New York, and also by the appearance of the political horizon.

" The first assorting by us was in November, after the nine banks were thrown out. At that time the defendant and Marine and Fire Insurance Company held from $60,000 to $90,000 of the bills of rejected banks. The bankers could not, during the winter, tell which would depreciate, and which would not, until we had the State Auditor's Report in January last, which showed the securities for each bank, and the circulation. During the Winter and early months of Spring the stocks of all the banks were varying and fluctuating. Previous to the meeting of the bankers, at which the thirty banks were thrown out, we could not tell with any certainty what banks would be thrown out by the bankers. Of those thirty, we had $170,000. I have no means of telling how much of the issues of the same banks was held by the other city bankers. After that meeting, the currency was very unsettled, and the feeling in consequence was very unsettled and anxious in regard to it; and that anxiety was largely increased after the 19th and 20th of April. When hostilities had begun, this feeling continued likewise to grow worse till the 18th of May, when the whole circulation depreciated, and was thrown out, and ceased to circulate. At that time the defendants, or Marine and Fire Insurance Company, had on hand between $1,200,000 and $1,300,000. That amount included all the funds of all kinds in the bank, reserved fund and all.

" After the 18th, I don't recollect that any money of this kind was offered on deposit. The defendants received and

continued to receive checks on themselves in payment of debts due the bank, and they have received them ever since in payment.

" Prior to the 18th, this currency had flowed into the city from the country in an unusual degree, so that both defendants and the Marine and Fire Insurance Company had to increase their clerical force. I know that a great many of the country bankers would not receive bills of the banks which we were receiving here, though they were received by others. The draft and current of the circulation was into the city at that time. Before we gave instructions to the paying teller, we looked at the account, and judged as near as we could when the money was deposited by each depositor, and we went on the basis that those who had deposited in April and May were only entitled to the lower grades of the currency, for the reason that was all we did get in those months; and the instructions to the teller were given accordingly. Those whose deposits had come in before April, were entitled to a better class of currency. No special instructions were given to teller in plaintiff's case. The average value of what was actually in circulation in April and May, was from fifty to sixty cents on the dollar; but that estimate does not include the bills which had been rejected; but taking the whole body of the bills together, it was from sixty to seventy cents on the dollar. This estimate includes good, bad and indifferent, whether in actual circulation, or assorted and withheld from circulation.

" I can't say that I have any personal knowledge of what was deposited by plaintiff. I could not say when the deposits were made by the person whose checks the plaintiff deposited, whether in April or May, or previously; have no knowledge on the subject. All the drafts deposited by plaintiff, drawn on other banks, were paid by those banks in the course of our daily exchanges. The defendant was ordinarily the creditor in all those settlements. The defendant had more customers who gave checks and drafts on other banks, and deposited with others, than the others had on us. If we had done less with other banks, plaintiff would have been better off. None of the November discredited, belonged to the Marine Bank. This all belonged to the Marine and Fire Insurance Company. None of the $170,000 belonged to defendant. All of it belonged to the Marine and Fire Insurance Company. I don't recollect how much of the currency we had on hand, on May 18th, belonged to defendant. I don't know that any of it did. After the 18th, neither the Marine and Fire Insurance Company, nor the defendant, received checks on other banks,

35

or Illinois bank notes, in payment of debts due them, nor would the other banks. I don't know of a single instance in which those bills were used as currency or money after the 18th. Defendant was organized under the general banking law, some time after that law went into force."

Defendant below here offered the following in evidence, which were read as such, viz. :

Letter from plaintiff to defendant, April 29th, 1861 :

*Macomb, Ill., April 29.*

H. B. Dox, Esq., *Cashier Marine Bank, Chicago :*

*Dear Sir :*—We notice in the Reports a list of current money, in the *Tribune* of this morning, that they report the three following banks as good : Grayville Bank, Shawanese Bank, Southern Bank of Ill. Do you take these ? Please inform us, and oblige

Yours truly,                    CHAS. CHANDLER & CO.
                                Per H. C. Truman.

Letter from plaintiff to defendant, May 10th :

*Macomb, Ill., May 10, 1861.*

H. B. Dox, *Cashier Marine Bank :*
Enclosed find for Col. and our credit:
        O. S. Camp........................$1,600.00.
                Yours truly,         CHAS. CHANDLER & CO.
                                    Per J. H. Cummings.

Letter from plaintiff to defendant, May 14th :

*Macomb, Ills., May 14th, 1861.*

H. B. Dox, *Cash. Marine Bank :*
*Dear Sir :*—Please send us, per express, currency, $2,000.
                Yours truly,         CHAS. CHANDLER & CO.
                                    Per J. H. Cummings.

Letter from plaintiff to defendant, June 10th :

*Macomb, Ill., June 10th, 1861.*

H. B. Dox, *Cashr., Chicago, Ill. :*
Please render our account current, as we wish to compare with our books.
                Yours truly,         CHARLES CHANDLER & CO.
                                    Pr. J. H. Cummings.

The court gave the following instructions, which were read to the jury ; to the giving of which instructions the defendants excepted :

1. A deposit commonly signifies a bailment of property for custody without compensation, the title remaining with the depositor, and the depositary acquiring no right in the thing deposited, but to its mere possession and custody. Hence the depositor is entitled to a return of this specie chattel on demand, and to an action to recover its possession when wrongfully withheld. As a consequence of this princi-

ple, if the property is lost, stolen or destroyed, while in the possession of the depositary, and without gross or willful negligence on his part, the loss falls on the depositor.

2.   But where the subject matter of the deposit or loan is money, wheat or other property, and it is delivered to the depositary for use or consumption, the law implies a contract to return, not the thing deposited or lent, but an equivalent of the same kind, nature or quality.   In such cases the title to the thing deposited rests in the depositary *ipso facto*, and it remains at his risk.   The only right of the depositor is to a return of an equivalent in kind or value, and his right is not impaired by reason of the subsequent loss or destruction of the property in the hands of the depositary.

3.   Such is ordinarily the relation implied by law, from the dealings between a banker and his customer, where no special agreement exists varying their rights.   The money, checks or bills which are the subject of the deposit, become the property of the bank, and the depositor becomes a creditor.   If stolen, lost or destroyed, or if they become of no value by reason of depreciation, the bank must sustain the loss.   His legal title having passed by operation of law, his right is resolved into a mere *chose in action*, or claim against the bank for the value of the deposit, usually fixed by the credit given, as in the case of an ordinary loan of money.   Indeed, a general deposit with a bank is termed a gratuitous loan, payable to the depositor on demand.

4.   In this case, therefore, the first question for the jury to consider, is, what is the nature and character of the relation arising out of the dealings between these parties as disclosed by the evidence?   Is it the ordinary relation of a customer with his banker?   If so, then what was the subject matter of the deposit?   Was it money, or currency, or something else?   And, first, as to the relation of banker and customer; on this point the court instructs the jury:

5.   That if the defendant was engaged in banking, and in receiving general deposits from its customers; if the plaintiff, as an interior banker, kept a deposit account with the defendant, and deposited drafts, checks and currency to his own credit, to be drawn against from time to time, in accordance with the usage of banks; that if the moneys thus deposited were, according to like usage, mingled and intermixed with the moneys of other depositors, and used by the defendant in the course of its business, then and in that case the relation implied by law is that of banker and customer, or debtor and creditor, and the title to the currency or money deposited vested in the defendant, and in the absence of any special

arrangement or understanding varying or modifying the rights of the parties, the subject of the deposit remained at the risk of the defendant.

6.  If this relation is found to have existed, the jury should next inquire into the nature and subject of the deposit. Was it money, current bank bills, or depreciated bills of Illinois banks, circulating at the time as money? If the latter, then were these bills received on deposit as money or currency, to be accounted for on demand, in like current funds or money? Or were they received as depreciated bills *eo nomine,* upon an agreement, expressed or implied, that they should be accounted for in identically like bills of the Illinois banks, whether current or uncurrent at the time of demand? In determining this question, the jury should inquire into the course of dealing between the parties, the state and condition of the currency, the nature and value of the deposits, and whether or not any express arrangement existed regulating and fixing the basis of their dealings with each other.

7.  On this point the court instructs the jury, that if they find, from the evidence, that the deposits were made in Illinois bank bills, passing current at the time in all business transactions as money, and as such were accepted and credited by the defendant, then the law implies a promise to pay in Illinois or other bank bills current at the time of demand, though the bills deposited were subject to a discount for specie when deposited, and subsequently became entirely discredited and greatly depreciated. Such a contract can only be discharged by the payment or tender of bank notes current at the time of demand, or their equivalent in money; and the measure of the plaintiff's damages, in this case, would be such value on the 21st of June, the time of the demand, with interest thereon to date. And if no bank notes were then in circulation as money, the engagement became absolute for the payment of money. For when an amount of money is made payable in a particular thing, the contract can only be discharged in the identical description of property called for in money. Nothing else can be substituted.

8.  It must, therefore, be manifest to the jury, that the rights of the parties here strictly depend upon the nature of the deposit, and their intentions concerning it. Whether the deposit of bills was made and accepted as currency on the basis of money, and credited as such, or as a commodity or species of property, to be accounted for in the like kind and quality, rather than in money. The law will allow parties to deal with each other on any basis which is legal, and their intentions will govern in the determination of their respective

rights. No principle prevented these parties from dealing with each other in Illinois bank bills as a specific commodity or as currency. If the deposits were intended to be received as currency, and were credited at their nominal value as such, then the law will enforce the payment in currency, though the bills were depreciated below their nominal value, and have since gone out of circulation altogether. Parties make their own contracts, and mere inadequacy of consideration is never a defense to them, unless so gross as to be evidence of fraud. If, on the other hand, the parties were dealing in these bills as a species of merchandise, to be repaid in kind or value, then the law will enforce the agreement, and not impose a different one upon them. When the subject of deposit is ascertained, then the law will imply a promise to pay in kind, or an equivalent in value. If money, then in money; if currency, then in currency; if in stock or depreciated bank notes as a species of property, then in each case the like, and not in something else of a different nature or value. Where the deposit is property, then a merchantable article of average value of the kind deposited must be delivered under the contract, and less than that will not be a legal tender.

9. Therefore, if the jury find, from the evidence, that by the course of dealing between the parties, or by their express agreement, the deposits were made in depreciated bank bills, and as such accepted, to be repaid by the defendant in the same kind of bills, without regard to their value as currency, or in money at the time of the demand, then the measure of plaintiff's damages is the value in money of an average lot of such Illinois bank bills as were in circulation after the 1st of April, of the nominal amount due the plaintiff, with interest at 6 per cent. to this date.

10. As a part of the evidence tending to establish the character of the arrangements and relations between the parties, a paper, signed by the plaintiff, and in the following words, has been given in evidence, viz.:

CHICAGO, April 26th, 1861.

"We, the undersigned, citizens and business men of Chicago, agree to receive and pay out as currency, in payment of debts, and in the general transactions of business, during the present war, the notes of all the banks of this State at present taken by the following named banks and bankers of this city, provided the bankers named below agree to do the same."

To this is attached the following instrument, purporting to be signed by all the banks and bankers therein named:

"In accordance with the above, we, the undersigned, bank-

ers, do hereby ratify and confirm the agreement therein expressed."

11. Among the bankers referred to, are two incorporated companies, and their assent is expressed by the signatures of their respective presidents. It is claimed by the plaintiff that if those officers had no authority, express or implied, to execute the agreement, the plaintiff is not bound by the promise alleged, as his promise is conditional. This is the law, and before any weight as evidence shall be given to this agreement, in determining the basis of the dealings between the parties, the jury must be satisfied, from the evidence, that it was signed by authority of said companies, and is binding upon them; unless signed by all the parties named, it is not in force as against the plaintiff, and the defendant can derive no benefit under it. Therefore,

12. If the jury find that no express authority existed, and that the only evidence from which an authority could be implied is the fact that those institutions continued to do business with such bank notes as are described in the said agreement, in the same manner as they had done before, then such fact is not in itself sufficient for that purpose. And unless the jury should further find that the making of such an agreement was within the scope of the duties of the officers signing it, they will reject it altogether from their consideration.

13. If the jury find that the instrument was duly executed by the parties, then its operation is by way of *estoppel*, so far as third persons were induced to act upon the faith of it. In this view it is not material whether it was actually signed by the defendant as well as by the plaintiff, in order to give the defendant a right to claim under it. But to entitle the defendant to make that claim, it must be proved that the defendant dealt with the plaintiff solely with reference to and on faith of it. But if the defendant did not rely upon it, and its dealings with the plaintiff had no reference to it, then the plaintiff is not estopped from alleging the want of mutuality or binding obligation of the same, and the jury should disregard it.

14. But the evidence in this case may show that the business relations between the parties were of a two-fold character, viz., that of principal and agent, with respect to the checks and drafts sent by the plaintiff for collection, and of depositary of the moneys after they were collected by the defendant. If the defendant was thus employed, and as agent received bills and drafts for collection, then the law imposed upon the defendant the duty of making such collections in money, unless authorized to collect the same in the depreciated currency then in circulation as money. Such authority may be implied from

the course of dealing between the parties. If the jury find that such authority was given, and that the defendant was instructed to collect in such bills and put the same to the plaintiff's credit as a depositor, and did so, then the liability of the defendant is that of a depositary of the plaintiff's funds, and is to be ascertained and settled by an application of the principles already stated. In other words, the case is left before the jury precisely as if the defendant had received no paper for collection, and as if the several deposits had been made in Illinois currency by the plaintiff, and not through the medium of collections. That is to say, were the deposits made as currency treated as money in the dealings of the parties, or in depreciated bills as such, as already more clearly defined in these instructions?

Defendant asked the court to give the following instructions to the jury, which the court refused to do; to which decision in refusing to give such instructions, defendant then and there excepted:

1. If the jury believe, from the evidence, that the funds received by defendant were received in payment of notes, drafts or bills sent to defendant for collection, and that the said notes, drafts or bills were collected for plaintiff at his instance or request, either express or implied, in depreciated Illinois bank notes or currency, and not specie, then the law is for defendant in this action, the declaration being only for money, and not depreciated currency or other specie commodity or property.

2. If the jury believe, from the evidence, that defendant, acting at the instance and request of plaintiff, received by way of collection for him the funds sued for in this action, and such funds were depreciated bank notes or currency at the time they were collected, then the plaintiff could only recover, in any event, the value of the funds collected, or the balance on hand at the time of demand made on the 21st of June, 1861, with interest.

3. If the jury believe, from the evidence, that at any time during the continuance of the business transacted between the plaintiff and defendant, that the plaintiff stipulated or agreed that during the war they would receive and pay out Illinois bank notes in payment of debts, and ordinary transactions of business, and the defendant, relying upon such agreement, accumulated a balance of collections, made upon account of plaintiff, in such Illinois bank notes, and that the funds sued for were received in Illinois bank notes, upon plaintiff's collections and account, then the plaintiff can only be entitled to receive such notes, or in case of refusal of de-

fendant to pay him such notes, then their value in money or coin at the time of demand made on the 21st of June, 1861.

But if, upon demand made, the plaintiff was offered Illinois bank notes in payment of his balance, then the plaintiff cannot recover in this action, the tender having discharged the defendant of any default, or failure to perform his contract.

4. If the jury believe, from the evidence, that the defendant collected, at the request of plaintiff, or by his assent, large amounts of Illinois bank notes or currency, depreciated in value at the time below that of specie, in payment of bills, drafts, or notes, sent to defendant by plaintiff for collection, and held the proceeds subject to his demand, according to his request, or instructions, and according to the ordinary usage of bankers in such cases, then and in that case there was existing the relation of agent on the part of defendant to the plaintiff as their principal; and if defendant exercised the ordinary diligence of other bankers in like cases, then and in such case the law does not cast the risk of further depreciation or loss on the funds received, upon defendant; and the plaintiff can only recover the actual or average value of the depreciated medium at the time of the demand made by the plaintiff.

5. If the jury believe, from the evidence, that the defendant acted in pursuance of the request, or by direction or assent of plaintiff, in making collections of checks, notes or bills in Illinois bank notes or currency, when they were depreciated at a value below that of specie, and the defendant acted with ordinary diligence, according to the usage and custom existing among bankers in Chicago—this constituted the relation of principal and agent, and defendant was not liable to plaintiff except for the same or like funds to those received; and if such funds were tendered to plaintiff on demand made, it was a sufficient discharge of the liability arising out of the contract between them.

6. If the jury believe, from the evidence, that plaintiff sent to defendant for collection, notes, bills and drafts, with the knowledge that the financial business of this place was done with a depreciated currency, fluctuating in value from causes out of the control of the defendant, and expressly or impliedly authorized the defendant to receive payment of such collections in such currency, and that defendant did so receive payment of them in such depreciated currency, and, by direction of plaintiff, placed such funds so received to his credit; and if the jury further believe, from the evidence, that defendant mingled the funds so received with its own funds of a similar character, according to the usage and custom of bank-

ers in like cases, and that all defendant's like funds, including those collected for the plaintiff, depreciated in value after such collection, from causes not within the control of defendant, then the loss of such depreciation of the funds collected by defendant for plaintiff, must be borne by the plaintiff; and he is only entitled to recover of the defendant such sum of money as the jury shall believe, from the evidence, was the average value in coin, on the 21st day of June, 1861, of the notes of all the banks of Illinois that were used as currency after the first day of April, 1861, with interest from that date for the balance due from defendant to plaintiff for such collections.

7. If the jury believe, from the evidence, that it is the usage and custom of banks and bankers to mingle all the funds received by them in a common mass, and that according to such usage the defendant mixed the funds received on account of plaintiff with its own, and that its own funds with which plaintiff's were mingled were composed of the notes of the banks of Illinois, received by it in its ordinary course of business for itself and its customers, which were afterwards depreciated in value from causes not within defendant's control, then the loss by such depreciation on plaintiff's funds must fall on him.

Therefore, if the jury believe, from the evidence, that at the time defendant made the collections for plaintiff, and the several other deposits were made by him, the circulating medium of this vicinity and city was the depreciated notes of the banks of this State and Wisconsin, and that plaintiff knew it, and expressly or impliedly authorized defendant to collect his notes, drafts and checks in those bills, place them to his credit, and mix them with the like bills belonging to defendant, and that the parties dealt with each other with the understanding that defendant should collect such currency or depreciated paper money, and that plaintiff should only demand like funds of defendant in payment of such collections, whether of current value at the time of demand or not, then the loss by the depreciation of such funds after they were received by defendant must fall on the plaintiff, for the balance due from defendant to the plaintiff for collections made for him, which nominal balance is agreed to be the sum of

The jury found plaintiff's damages at $16,375.83—a new trial was denied, and a judgment was rendered on the verdict.

The following are the errors assigned:

1. The court erred in permitting the evidence offered to go in, under the money counts of the declaration, against the objections of defendant.

2. The court erred in giving his instructions to the jury.

3. The court excluded and refused to give the instructions asked for by defendant.

4. A new trial should have been awarded to defendant, the verdict in the case being against the law and the evidence.

5. A new trial should have been awarded, upon the ground that the whole record and evidence shows that the plaintiff recovered as for "money had and received," the same as if money, and not bank notes, or indebtedness, had been the real and only foundation and cause of action.

6. The court, in all its ruling, treated depreciated bank notes or currency, the same as money, and allowed the jury to assess damages as upon a cause of action founded upon money, instead of a contract, or cause of action, payable in other commodities only.

7. The court refused to instruct that money only could be the subject of the recovery in action, and that if bank notes were non-specie paying, or depreciated, they could not be regarded as money by the court or jury, in any case whatever.

8. The court refused to instruct that, in cases of agency, the plaintiff, or principal, took all the risk of loss or depreciation on currency, where the agent followed his directions in receiving and holding it; and that in this case, such was the relation legally existing between the parties.

9. The court gave no instructions as asked, but delivered a general essay, or principle, which had no application to the facts in the case.

10. The whole recovery is a subversion of the clearest and most fundamental principles of law. 1st. In setting up false standards of value in actions for money. 2nd. In establishing a false measure of damages. 3rd. In charging an agent in respect to losses of his principal. 4th. Putting bank notes, not equivalent to coin, or specie, in the place of money.

C. BECKWITH, FULLER & MCCAGG, and THOMAS HOYNE, for Appellant.

J. GARY, for Appellee.

WALKER, J. In determining this case, it will be proper, first, to determine, whether the deposits made by appellee were a bailment only, for safe keeping by the bank, or were made to be passed to appellee's credit, in the usual course of banking business. If for the former purpose, then the appellee must be responsible for any depreciation in the value of the funds which occurred, before a demand was made, if appellant in good faith preserved the identical funds placed in

the hands of the bank. If the relation of the bank to appellee, was simply that of a bailee for safe keeping, and the identical funds were preserved, and a loss ensued by depreciation, no rule of law, principle of reason or justice, can hold the bank liable for such a loss. Such a liability would be inconsistent with the undertaking, which would only require a return of the thing deposited, uninjured by the acts or neglect of the bailee. The fact that the deposit consisted of bank bills, would not distinguish it from a deposit for safe custody, of articles of property, in the rights, duties and liabilities incurred by the parties.

If, on the contrary, the deposits were designed by the parties to have become a loan to, or indebtedness by the bank, the relation of the parties would have been that of any other debtor and creditor. Banks, in the transaction of their business, may occupy either of these relations. But, when the funds are deposited to be held and returned in the same bills or coin, the deposit becomes a special one, entirely different from a general one, which authorizes the bank to use the funds in the course of their business. In this case, the evidence shows, that the deposits arose from collections, made by the bank, for the appellee. The latter, at various times, forwarded to the former, perhaps without an exception, bills, notes and checks, which, when collected, were placed to appellee's credit.

The funds thus received were placed in the general fund of the bank, and paid out indiscriminately in the course of the business of the bank. The evidence likewise shows, that these funds when collected were current, and passed as money in the payment of debts, and the various other business transactions. They at that time answered all the purposes of money, and appellee was credited by them as money. From all of the evidence in the case, it appears, that the parties considered and treated it as money, until the 18th of May, when it became so much depreciated that it ceased to circulate as such, and was thenceforth considered and treated as a commodity, bought and sold by the banks and brokers at a heavy discount. Nor was there any evidence tending to show, that the bank had any directions to hold the identical funds received at the risk of appellee. · Nor is there any pretense that the bank has lost a farthing, on the money collected. It went into the common fund of the bank, and for aught that appears, every dollar may have been paid out at par, before it ceased to circulate as money.

But as the relation, of the parties to each other, was that of debtor and creditor, even if no portion of the funds had been

disposed of by the bank, the liability would have been the same. As well might the purchaser of a horse, of grain or other commodity, when called on to pay, insist that the article had depreciated in value, since the purchase, and that he should be relieved from paying the amount of the depreciation. No one would ever suppose, that if a merchant were to purchase a quantity of grain or other produce, and give the seller a credit at the market price, and it afterwards declined in the market, that the loss would fall upon the seller, or that he should receive the same quantity and quality of grain. The same is true of almost every character of business transactions involving a sale. To establish as a rule, that in cases of that character, the loss by depreciation in price, or otherwise, should fall upon the seller and not the buyer, and give it a practical operation, would well nigh revolutionize every description of business, and would produce incalculable injustice and wrong.

The proof of the depreciated value of the paper when received, cannot change the liability of the debtor for bank bills, any more than if it had been for produce, at a higher rate than its market value. Nor can the special custom of banks in a particular locality, change the laws of the land, regulating the value of the currency and fixing the standard value of the current coins. That parties may contract to receive any commodity, in lieu of money, in payment of indebtedness, is undeniably true. This can only be done by special agreement and not by usage. No custom can compel a creditor, in the absence of a special agreement, to receive anything but the constitutional currency of the country. The fact that the business men of the particular place, have been in the habit of receiving depreciated paper money in payment of their demands, by no means proves that all creditors in that locality have agreed to receive the same, much less a person residing hundreds of miles distant. To have such an effect, a special agreement must be proved.

The doctrine of agency has no application to a case of this character. There is nothing to show, that the bank was the agent of appellee, beyond the fact that it collected the money. But even if it did appear that the bank acted as the agent of appellee, it also appears that the former appropriated the funds when collected, to its own use, and made itself debtor for the amount, by passing it to the credit of appellee, and by mingling the funds thus collected with those of the bank, and using them as its own. The proof shows, that it was the custom of the bank to so appropriate such funds, and to pay when called for by the creditor. It would hardly be contended,

Marine Bank of Chicago *v.* Chandler.

if an attorney were to collect a debt for a client, in bank bills, and appropriate them to his own use, that if the bank afterwards failed, that he would be exonerated from payment. No difference is perceived in the two cases.

It is further insisted, as appellee signed the agreement to receive and pay out the bills of Illinois banks, during the continuance of the present war, that he was bound to receive such paper in discharge of this debt in June, when he made the demand of payment. The testimony shows, that after the 18th of May, 1861, appellant, and all the other parties to that agreement, refused to receive such funds. From this fact it may be reasonably inferred, that by mutual consent this agreement was ended, and all parties released from its further observance. When appellant and all of the parties to this agreement disregarded its stipulations, no reason is perceived why appellee should be bound by its provisions. Appellant has no right to enforce an observance of the agreement against appellee, when all other parties to it are released.

No error is perceived in giving appellee's instructions, or in refusing those asked by appellant. The verdict is warranted by the evidence, and the judgment is affirmed.

*Judgment affirmed.*