# SUPREME COURT

### OF

# ILLINOIS.

### THIRD GRAND DIVISION.

## APRIL TERM, 1864.

STRONG AND WILEY BROTHERS

*v.*

JOHN B. KING.

1. BILLS OF EXCHANGE — *of the time of presentation of a sight draft.* The holder of a sight draft, in order to charge the drawer and indorsers, must put it into circulation, or present it for payment, at the farthest, on the next business day after its reception, if within reach of the person upon whom it is drawn.

2. SIGHT DRAFT — *when it matures, and when it must be protested.* Such an instrument matures when presented for payment; and if presented on the day of its reception, it is thereby matured, and if not then paid, it must be protested for non-payment on the same day, and due notice given, in order to charge the drawer and indorsers, precisely as if it had been made payable on a specified day.

3. SAME — *must be presented during business hours.* And such a bill, like all others, should be presented for payment by the holder, or his agent, during the business hours of the day.

4. SAME — *may be again presented by a notary, after business hours.* And after a bill has been presented by the holder, or his agent, for payment, it may be again presented by a notary, for the purpose of making a protest for non-payment, after business hours, on the same day.

5. SAME — *when the drawee is not found, whether an application for payment amounts to a presentation.* But if the holder of a sight bill presents it, and finds no one at the drawee's place of business to honor it, he may elect to consider the bill as not presented for payment; but any act evincing an election to consider it as presented for that purpose, will bind the holder, and he cannot, after such election, claim that the bill was not presented for payment.

6. SAME — *what will constitute a payment.* The bare reception of a check from the drawee for the amount of the bill, will not, ordinarily, be considered as a payment, but only as a means of payment.

7. SAME — *effect of a surrender of the bill, in such case, to the drawee.* And such is the rule, whether the bill is surrendered to the drawee at the time of receiving the check, or is retained by the holder until payment is consummated. It may be imprudent to surrender the bill before actual payment is made, but such improvidence does not change the rule.

8. SAME — *accepting a check from the drawee of the bill, is not conclusive in its effect.* Although the bare reception of a check will not, usually, be considered as a payment, but simply as a means of obtaining payment, still, it may be shown that the check was, in fact, received as absolute payment.

9. SAME — *what is evidence that the check was taken as payment.* That fact may be established by showing an express agreement to that effect, or by showing such circumstances as will satisfy the mind that such was the understanding of the parties at the time the check was taken.

10. If the holder of the check appropriates it to his own use, by putting it in circulation, it then becomes a payment of the bill for which it was received.

11. DEPOSIT OF CHECK — *whether as money or for collection.* Or, when the holder of a check received for the amount of a bill, deposits it with his banker, it becomes a question of fact whether such deposit was made as and for so much money to the credit of the depositor, or whether the check was deposited for collection merely.

12. SAME — *presumption in respect thereto.* If deposited in the usual course of business, the presumption would be, that it was for collection, merely, and not as money.

13. TELLER OF BANK — *his authority, and its effect on the deposit of checks.* By the usage of bankers, the teller with whom such deposits are generally made, has no authority to receive them as and for money, and this is known to the depositor; but the teller has authority to receive checks for collection, and, therefore, the presumption is, that they were received for that purpose, until the contrary is shown.

14. CHECK DEPOSITED AS MONEY — *operates as payment of the bill for which it was given.* If, however, a banker receives a check as and for so much money, and gives the depositor credit therefor, such an act is an appropriation of the check by the holder, and operates as a payment of the bill for which it was received, from the moment the deposit is made.

15.   And from that time the check becomes the absolute property of the banker with whom it is deposited, and the bill ceases to exist, and cannot be revived, except by the agreement of all the parties who would be affected thereby.

16.   BANKER MAY ACT AS AGENT *to collect the check, as well as any one else — effect of his so doing.* But the holder of a check may as well employ his banker as an agent to collect it, as any other person. And if the holder deposits the check with his banker for collection, such deposit is precisely the same in its legal effect, as handing the check to a messenger for the same purpose.

17.   DEPOSIT OF CHECK FOR COLLECTION — *not a payment of the bill for which it was given.* Such a deposit will not operate as a payment of a bill for which the check was taken.

18.   WHEN CHECK MUST BE PRESENTED.   In order to avoid loss by the failure of the drawee, the holder of a check ought to present it for payment before the expiration of the next business day after it is received.

19.   BUT TIME FOR PROTESTING THE BILL, *not affected thereby.*   But the time within which a check must be presented to charge the drawer, in nowise regulates or fixes the time when a protest must be made in order to charge the drawer or indorser of a bill for which the check was received as a means of payment.

20.   DILIGENCE REQUIRED, *when a check is received as a means of payment of a bill.*   If a check is received as a means of payment, the party receiving it must procure its payment on the day of its reception, or return it for non-payment on that day, so as to have the bill for which it was received protested for non-payment on that day.

21.   Whilst a presentation on the next business day is sufficient to charge the drawer of the check, it is no excuse for the non-protest of the bill on the day of its presentation for payment.   The negligence of the holder of the check in not procuring payment of the bill on the day of its presentation by the means he receives for that purpose, or otherwise, discharges the drawer and indorsers of the bill if protest is not made.

22.   WAIVER OF PROTEST — *subsequent promise to pay.*   The consequence of a neglect to protest a bill may be waived by the person entitled to take advantage of it; and a promise to pay the bill, made by the person insisting upon the want of protest, after he is aware of the laches, to the holder, amounts to a waiver of such laches, and admits the holder's right of action.   But if such promise be made in ignorance of any material fact, it will be otherwise.

23.   APPLICATION OF THESE RULES TO THIS CASE.   In this case a sight draft was drawn in Chicago on New York, which the holder transmitted to New York for collection.   It came to hand in New York on a Saturday; and, although it was not necessary to have presented it for payment until the following Monday, it was presented on the day it was received, accepted by the drawees, who gave a check for the amount.   The check was deposited in bank on that day, and on Monday was returned from the clearing house as not good, the drawers having failed on that day. Then, on the Monday mentioned, the bill for which the check had been given, and

which had been presented on the preceding Saturday, was protested. *Held*, that the bill was not protested in time to charge the drawer and indorsers.

24. USAGE — *when not binding.* It can hardly be supposed that a usage in New York city, that checks may be received as a means of payment for a bill, and the bill be held over until the next day without protest, for the purpose of ascertaining whether the check will be paid, could alter the general commercial usage of the world, however long or well established. If such a custom does obtain in New York it cannot affect the law of other places.

APPEAL from the Superior Court of Chicago.

This was an action of assumpsit commenced in the court below, on the 23d day of March, 1860, by John B. King against Strong & Wiley Brothers, to recover upon a bill of exchange drawn by the defendants, at Chicago, upon the Ohio Life Insurance and Trust Company, New York, for one thousand dollars, in favor of Williams & Brother, and which, by successive indorsements, came to the hands of the plaintiff.

The following is a copy of the instrument sued upon:

CHICAGO, ILL., Aug. 19, 1857.

Pay to the order of Mess. Williams & Bro., One Thousand Dollars, value received, and charge the same to account of

[No. 1253.]                    STRONG & WILEY BROS.

To the Ohio Life Ins. and Trust Co., }
                    New York.        }

[Indorsed].

Pay R. K. Swift, Brother & Johnston, or order.
                    WILLIAMS & BROTHER.

Pay John B. King, or order, without recourse on us.
                    R. K. SWIFT, BRO. & JOHNSTON.

The defendants pleaded the general issue, with notice that, upon the trial of the cause, they would prove and insist that the draft sued upon was paid by the drawees to Swift, Ransom & Co., the holders thereof, and that said drawees then and there canceled the same and charged the amount of said draft to the defendants.

The facts upon which the rights of the parties depend, as developed on the trial of the cause, are as follows : The bill in question was indorsed, on the day of its date, by Williams & Brother, in whose favor it was drawn, to R. K. Swift, Brother & Johnston, of Chicago, who immediately indorsed and transmitted the same to Swift, Ransom & Co., of New York, for collection.

Swift, Ransom & Co. received the draft, by mail, on Saturday, August 22d, 1857; and on that day, wrote a receipt of payment upon it, and sent it by a messenger to the office of the drawees, the Trust Company, for collection. The Trust Company accepted the draft, and drew a check for the amount upon the American Exchange Bank, the messenger delivering the draft to the Trust Company, and returning the check to his employers. Swift, Ransom & Co., on receiving the check from their messenger, sent it to the Merchants' Bank, where they kept their account, in order to have it passed through the clearing house on the following Monday. On the next Monday the check was returned from the clearing house, as not good ; the Trust Company having, on the same day, suspended, and not opened for business, and its office, books, papers, &c., taken into the custody of the sheriff. Swift, Ransom & Co. at once upon receiving the check from the clearing house, sent a notary to the office of the Trust Company, who found the draft in the hands of the sheriff, and he, notwithstanding the Trust Company were willing to return it, was unwilling to surrender it. Payment of the draft was then demanded and refused, and it was accordingly protested, and notice thereof by mail was given to Strong & Wiley Brothers, the drawers. On the same day Swift, Ransom & Co. telegraphed to Swift, Brother & Johnston that the Trust Company had failed, and that the draft was unpaid.

It is claimed on the part of King, the plaintiff, that Strong, one of the defendants, subsequently promised R. K. Swift, Brother & Johnston, that they, the defendants, would pay the draft, and testimony was introduced touching that subject, which it is not necessary to set out here, inasmuch as the court,

in disposing of the case, have remitted that question to another jury upon a retrial in the court below.

In January, 1860, the draft was indorsed by R. K. Swift, Brother & Johnston, to the plaintiff King.

Upon the trial the plaintiff set up, *first*, that it was the general custom of the drawees of this bill, the Trust Company, to pay all bills drawn upon them in checks, unless in the case of a special request for money; and, *second*, that the custom among banks and bankers of New York city was not to send checks received by them, on the same day, to the banks upon which they were drawn, for collection, but to send them on the day following to the clearing house for exchange and adjustment. These customs, however, are not regarded by the court as having been established, and a detailed statement of the testimony on that subject would not tend to elucidate any of the questions in the view taken of the case on its decision.

Voluminous instructions were given to the jury, which are omitted here, as no question arises upon them, other than the propositions of law, which are clearly set forth in the opinion of the court, as presented upon the facts.

The jury returned a verdict for the plaintiff, and assessed his damages at $1,276.50. A motion for a new trial was overruled, and a judgment was entered upon the verdict, from which the defendants prosecute this appeal. The important question arising under the assignment of errors is presented in the following proposition asserted by the appellants: The draft having no time of payment expressed on its face, was in law payable on presentation. But it was presented on the 22d of August, 1857; and if paid, it became null; while if not paid, it should have been protested on that day. It was not, however, protested, or noted for protest, until the 24th. Hence, the drawers and indorsers were discharged.

Messrs. ARRINGTON & DENT, for the appellants.

*First.* Our primary proposition is — the bill of exchange in this case was not protested on the day it became payable; and, therefore, the drawers and indorsers were discharged.

This inference results from the following considerations:

I.   The bill, having no time of payment expressed, was payable on presentment.   Edw. on Bills, 154, 156; Byles on Bills, 165; Story on Bills, sec. 50.

II.   The bill was presented for payment on Saturday, the 22d of August, 1857.   Therefore, it became payable on that day.

III.   The bill was either paid, or it was not, on the 22d of August, the day of presentment.   But if paid, it became null. And if not paid, it should have been protested, on that day, or, at least, noted for protest.   A foreign bill must be protested for non-payment on the very day it becomes payable, or the drawer stands discharged.   Edw. on Bills, 505, 507, 581, 583; Story on Bills, secs. 278, 419, note 3; and sec. 364; Chitty on Bills, top page, 538; 1 Pars. on Cont. 237.

It must be noted for protest on the day of dishonor.   *Bailey* v. *Dozier*, 6 Howe, 28; *Cook* v. *Rennick*, 19 Ill. 598.

The case of *The Commercial Bank of Penn.* v. *The Union Bank of New York*, 19 Barb. 391, 400, is directly upon the point, as to the necessity of protest on the day of presentment; and in that case, too, a check was taken upon presentment of the bill.

There is no case in the books — there is not even a *dictum* — which intimates that a bill can be legally protested for non-payment on the day after its presentment.

The case of *Russell* v. *Hankey*, 6 T. R. 13, adduced for the appellee, is not adverse to us.   Because the report does not show that the check was held over until the following day; or, that the bill was protested the day after its presentment.

Besides, that case turned upon the custom of London, and is not now the law in England.   Chitty on Bills, 451; Byles on Bills, 16; Story on Bills, sec. 419, note 3.

And even the usage of London was not to leave the bill with the drawee until the next day, but only for a few hours of the day when it fell due.   Chitty on Bills, top page 414.

Messrs. WAIT & TOWNE, for the appellee.

The draft in this case was payable on demand. The holders had till Monday, till the close of banking hours, to present it for payment. Chitty on Bills, 380; Story on Bills, 383.

Sunday is not to be counted as a day. The length of time such a bill is to be kept in circulation depends where it is going. It might be sent to Memphis, and from there to New York, and the drawer then be responsible, if presented in twenty-four hours after it reached New York. The rule in regard to time bills is different. They must be presented for payment on the day they are due; therefore, any claim of defense which the appellants seek to make is not only a technical one, but utterly void of justice. Their whole argument seeks to force us into greater diligence than the law requires of us. Pars. on Bills, 339–341.

We say that the draft was not presented for payment on Saturday, that what was done on that day was only a means of getting payment. On Monday it was duly presented and payment demanded and protested. *And this was within the time in which we were bound to present it and demand payment.* By the laws of New York the taking of a check is deemed but a means of getting payment. 15 Barb. 28; 4 Johns. 304; 20 Wend. 602; 1 Hall, 56; 4 Conn. 553.

The same doctrine is recognized in 10 Fost. 256; 29 Penn. R. St. 448; 14 How. 244; 20 N. H. 102, 354; 11 Ind. 22; 4 McLean, 128; 12 How. 225.

It is held in 3 Pick. 13, the effect of taking the check is governed by the laws of New York. The taking the check is, therefore, not at all in conflict with our position that what was done on Saturday was only a mode of presentment. In this position we are borne out by the English authorities. In the case of *Robson* v. *Bennett,* 2 Taunt. 398, decided by MANSFIELD, a party bought a bill of goods and gave a draft on his banker; on the same day it was carried to the house of the drawee and left, who marked it, which was equivalent to accepting it. The practice in regard to bills presented after 4 P. M., was to mark them, and it was usual that bills marked one day should be carried to the clearing house *on the next day,*

when the clerks met and paid them. On the next day the trader's clerk goes to the clearing house, and no clerk of the banker attends, and the check is not paid. The court says the check need not have been presented till the next day. What was done was an acceptance to pay next day at the clearing house, and there was no laches. Now, we were not bound to present this draft till Monday, and the two cases are, therefore, parallel. The argument used against us is that though not bound to present it till Monday we chose to do so on Saturday — that same argument is answered and fully by this case of *Robson* v. *Bennett.*

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court :

This was a sight draft drawn by Strong & Wiley Brothers on the Ohio Life Insurance and Trust Company, in favor of Williams & Bro. The last named firm indorsed the draft to R. K. Swift, Brother & Johnston, who indorsed the same to appellee. It was negotiated on the day of its date to R. K. Swift, Brother & Johnston, who, on the same day, sent it to Swift, Ransom & Co., of New York, for collection, and it reached them on Saturday, August 22, 1857. On that day Swift, Ransom & Co. indorsed upon the draft "received payment," and wrote their name under the indorsement, and sent it by a messenger to the Trust Company for payment. He received a check for the amount, drawn upon the American Exchange Bank, and left the draft in the possession of the company. This check was placed in the bank with which Swift, Ransom & Co. transacted their business, to go through the clearing house. On the next Monday the check was thrown out, at the clearing house, and on that day the Trust Company had suspended and did not open for business.

The check was on that day returned, but the assets and papers of the Trust Company were then in the hands of the sheriff, who, notwithstanding the Trust Company were willing to return the draft, was unwilling to surrender it to Swift, Ransom

2 — 35TH ILL.

& Co. Payment of the draft was demanded and refused, and the draft was then protested, and notice, by mail, was given to Strong & Wiley Brothers. On the same day Swift, Ransom & Co. telegraphed to Swift, Brother & Johnston that the Trust Company had failed, and that the draft was unpaid. It is like-wise insisted that after notice of protest appellants agreed to pay and take up the draft.

The first question presented is whether the protest for non-payment was in time so as to hold the drawer and indorsers. It may safely be stated as a rule that the holder of a sight bill, in order to charge the drawer and indorsers, must put it into circulation or present it for payment, at the farthest, on the next business day after its reception, if within reach of the person upon whom it is drawn. Chit. on Bills, 382. Such an instrument matures when presented for payment; and if presented on the day of its reception it is thereby matured, and if not then paid it must be protested for non-payment on the same day, and due notice given in order to charge the drawer and indors-ers, precisely as if it had been made payable on a specified day. And such a bill, like all others, should be presented for payment by the holder or his agent during the business hours of the day. And after a bill has been presented by the holder or his agent for payment, it may be again presented by a notary public, for the purpose of making a protest for non-payment, after business hours on the same day. Chit. on Bills, 458.

But if the holder of a sight bill presents it, and finds no one at the drawee's place of business to honor it, he may elect to consider the bill as not presented for payment, but any act evincing an election to consider it as presented for that pur-pose will bind the holder, and he cannot, after such election, claim that the bill was not presented for payment. *Mitchell* v. *Degraud,* 1 Mason C. C. R. 176.

The bare reception of a check from the drawee for the amount of the bill will not, ordinarily, be considered as a payment, but only as a means of payment, and this is the rule, whether the bill is surrendered to the drawee at the time of receiving the check, or is retained by the holder until payment is consummated. It

may be imprudent to surrender the bill before actual payment is made, but such improvidence does not change the rule.

Although the bare reception of a check will not, usually, be considered as a payment, but simply as a means of obtaining payment, still it may be shown that the check was, in fact, received as absolute payment. That fact may be established by showing an express agreement to that effect, or by showing such circumstances as will satisfy the mind that such was the understanding of the parties at the time the check was taken. If the holder of the check appropriates it to his own use, by putting it into circulation, it then becomes a payment of the bill for which it was received. Or when the holder of a check, received for the amount of a bill, deposits it with his banker, it becomes a question of fact whether such deposit was made as and for so much money to the credit of the depositor, or whether the check was deposited for collection merely. If deposited in the usual course of business, the presumption would be, that it was for collection merely, and not as money. By the usage of bankers, the teller, with whom such deposits are generally made, has no authority to receive them as and for money, and this is known to the depositor; but the teller has authority to receive checks for collection, and, therefore, the presumption is, that they were received for that purpose until the contrary is shown.

If, however, a banker receives a check as and for so much money, and gives the depositor credit therefor, such an act is an appropriation of the check by the holder, and operates as a payment of the bill for which it was received, from the moment the deposit was made. And from that time the check becomes the absolute property of the banker with whom it is deposited, and the bill ceases to exist, and cannot be revived, except by the agreement of all the parties who would be affected thereby. But the holder of a check may as well employ his banker as an agent to collect it, as any other person. And if the holder deposits the check with his banker for collection, such deposit is precisely the same in its legal effect, as handing the check to a messenger for the same purpose. Such a deposit will not

operate as a payment of a bill for which a check was taken. In such a case, if the check is duly presented and not paid, the depositor must receive it back from the messenger or banker acting as such. In order to avoid loss by the failure of the drawer, the holder of a check ought to present it for payment before expiration of the next business day after it is received. But the time within which a check must be presented, to charge the drawer, in nowise regulates or fixes the time when a protest must be made, in order to charge the drawers or indorsers of a bill for which the check was received as a means of payment.

If a check is received as a means of payment, the party receiving it must procure *its* payment on the day of its reception, or return it for non-payment on that day, so as to have the bill for which it was received protested for non-payment on that day. The person receiving a check for such a purpose, has no more right to send it through a banker for collection on the next business day, than he has to put it in his safe and send it by his clerk on the next business day. Whilst a presentment on the next business day is sufficient to charge the drawer of the check, it is no excuse for the non-protest of the· bill on the day of its presentation for payment. The negligence of the holder of the check in not procuring payment of the bill on the day of its presentation, by the means he receives for that purpose or otherwise, discharges the drawers and indorsers of the bill if protest is not made.

The consequences of a neglect to protest may be waived by the person entitled to take advantage of it, and a promise to pay the bill, made by the person insisting upon the want of protest, after he is aware of the laches, to the holder amounts to a waiver of such laches, and admits the holder's right of action. Chitty on Bills, 501.

When tested by these rules, it will be seen that there have not been proper steps to charge the drawer and indorsers in this case. The bill was received for collection by Swift, Ransom & Co., on the twenty-second day of August, and notwithstanding they might have delayed presenting it for payment until the twenty-fourth, which being Monday, was the next business

day, they saw proper to present it for payment on the same day it was received. By so presenting it, the bill became due on that day, and to have held the drawer and indorsers, precisely the same steps should have been taken as if the bill had in terms been payable on that day. And for that purpose it was necessary to have had it protested, and due notice given to the drawers and indorsers of the bill. Had it been specifically payable on the twenty-second, it would not be contended that a protest and notice of non-payment on the twenty-fourth would have been in time; and yet there is no difference in principle in the two cases.

The evidence of usage is not sufficient to establish a general custom, that checks may be received as a means of payment for a bill, and the bill be held over until the next day without protest, for the purpose of ascertaining whether the check will be paid. It can hardly be supposed that such a usage could alter the general commercial usage of the world, however long or well established. If such a custom did obtain in New York it could not affect the law of other places.

We have not deemed it necessary to consider the effect of an agreement, express or implied, on the part of Strong and Wiley, with the Ohio Life Trust Co., that drafts drawn upon funds deposited with it should be paid through the clearing house, according to a usage of paying them in that manner. It will be time to consider that question when such an agreement is shown, and it shall also be shown that Strong and Wiley must have known, in drawing the draft, that such agreement would be acted upon by the New York correspondent of Williams & Bro., and that it was so acted upon.

The instructions contravened these rules, and were therefore erroneous.

It was contended, that the appellants, after notice of the protest, agreed to pay and take up the draft. If such a promise was made in view of all the facts, attending the presentation of the draft for payment and its subsequent protest, there can be no question that their liability was revived. But if such a promise was made in ignorance of any material fact, it would

be otherwise. And it is for the jury, in view of all the evidence in the case, to say whether such a promise was made. And as the case will be passed upon by another jury it would not be proper to pass upon the evidence in this record, bearing upon that question.

The judgment of the court below is reversed, and the cause remanded.

*Judgment reversed.*