FRANCIS BURNHAM & another *vs.* BOSTON MARINE INSURANCE COMPANY.

Essex. March 4. — June 20, 1885. W. ALLEN, COLBURN, & HOLMES, JJ., absent.

In an action on a policy of marine insurance on "advances," evidence is inadmissible that, before the contract was executed, the parties agreed to insure "outfits" under the term "advances."

In an action on a policy of marine insurance on "advances," an expert testified that the word "advances" had not of itself a fixed and definite meaning in insurance; that it was sometimes used to describe an interest which could not be otherwise described; that, under the circumstances of the case, the word might apply to any pecuniary interest in anything put on board the vessel; and that certain articles might properly be insured as "advances," but that "outfits" would be a better word to describe them; that, if insuring them himself, he should so describe them; and that "advances" commonly meant advances to crew or advances on account of freight. *Held*, that this did not show that "outfits" had ever been insured as "advances," or an existing usage to this effect.

If the owners of a fishing-vessel have a lien on the catch for money expended for bait, such money may be insured under the term "advances."

The owners of a vessel, on receiving notice by telegraph of the vessel being lost by stranding, handed the telegram to the president of an insurance company, and made an oral abandonment. A month later, they made a written abandonment of the vessel to the same company, and also delivered to the president, who was the agent of another insurance company which had executed a policy of insurance on "advances on board," a notice, addressed to him as agent of the latter company, that they abandoned the vessel "insured under your policy" (stating the number of the policy on advances). *Held,* that the abandonment was sufficient.

CONTRACT upon a policy of insurance, dated January 19, 1882, against perils of the seas, whereby the defendant insured the plaintiffs, "lost or not lost, five hundred dollars on advances on board the schooner Madame Roland, free from claim for particular and (or) general average."

Trial in the Superior Court, before *Mason*, J., who reported the case for the determination of this court, in substance as follows:

The policy put in evidence showed that the words "advances on board the schooner" were written in place of the printed words "outfits, catch, cargo, or the freight on said cargo," which were struck out. The policy was issued to the plaintiffs by George Steele, the local agent of the defendant at Gloucester. Steele had authority to take risks and to countersign and issue policies, which were furnished him by the defendant, signed by its president and secretary. Steele was also the president of the Gloucester Mutual Fishing Insurance Company. The plaintiffs testified that the policy in suit was issued by him under the circumstances following: The plaintiffs were owners of the fishing schooner Madame Roland, which vessel they had recently bought of Steele, who was largely engaged in the fishing business in Gloucester; and which they equipped for and employed in the handline cod fishery. They had insured this vessel and her outfits in the above-named Gloucester company; and they had, as they supposed, all the insurance they could have on the vessel and on the outfits in that company. Some time after the policy was issued, Steele came to the plaintiffs' place of business in Gloucester, and told them that they were not sufficiently covered on their vessel, and ought to have more in case of total loss; that he could write $500 in the Boston Marine Insurance Company for them; they asked him how he was going to write it, and he said, "I shall not call it 'outfits.' I shall call it 'advances'; and it

will be all right." He then showed them a list of persons in Gloucester for whom he had written policies in that way; after some talk, they agreed that he should do it, and after a few days he sent them the policy in suit. All the evidence as to conversations between Steele and the plaintiffs was introduced against the objection of the defendant.

The plaintiffs also testified, that the schooner was making fishing trips from Gloucester to Georges Bank, the trips varying in length from two or three weeks in spring to five or six weeks in summer; that her crew consisted of a captain and nine men, who did not receive wages, but took shares of the catch instead; that each trip was settled by itself; and that the mode of settlement was, to divide the proceeds of the whole catch (which came into the plaintiffs' hands, and was sold by them) into two equal parts, first deducting from the whole the amount expended in bait and ice for the trip, and to assign one part to themselves as owners, and the other to the crew; to deduct from the crew's share the amounts expended for milk, towage, scrubbing vessel, medicine chest, wood, and water; and then to divide the balance of the crew's share among the members of the crew in proportion to the quantity of fish caught by each man. If any sums had been advanced by the owners to any member of the crew before or during the trip, such amount was deducted from his individual share before paying it over to him.

They also testified, that on or about July 19, 1882, the schooner left Gloucester upon one of these trips; that it was to be one of the longer trips, for which more stores were taken than for the shorter ones; and that they had on board the vessel when she started upon this trip provisions worth $175.66, stoves, kitchen furniture, and tin ware worth $146.74, lines, hooks, and other fishing gear and tools worth $123.95; also ballast, ice, salt, casks, and other articles of outfit worth $375.75. They also testified that they furnished the captain with $100 in bills to buy bait. The defendant objected to the above testimony as to what was on board the schooner, on the ground that it was not evidence of any advances on board her.

They also testified, that, prior to the sailing of the schooner on this trip, they had advanced certain sums to the different members of the crew, amounting in all to $60.14; which sums

were to be repaid by the men to whom they were made out of their respective shares of the proceeds of this trip when the same should come to be settled as above.

The plaintiffs called one Gore, an average adjuster of large experience in Boston, who testified that the word "advances" had not a fixed and definite meaning, of itself, in the business of insurance, but that its meaning depended upon the circumstances under which it was used, and that it was sometimes used to describe an interest which could not be otherwise described; that under the circumstances of this case the word "advances" might apply to any pecuniary interest in anything put on board the vessel; that he had examined the lists of articles which were put on board this schooner, and that everything on those lists might properly be insured as "advances." The evidence of this witness was admitted, against the defendant's objection. On cross-examination, he testified that "outfits" would be a better word than "advances" to describe the articles on board the schooner; that, if insuring them himself, he should so describe them; that he could see no reason for striking out the printed word "outfits" in the policy, and writing in "advances on board," if outfits were to be insured thereunder; that the word "advances" meant commonly "advances to crew," or "advances on account of freight;" and that it had been used in one of these meanings in the larger portion of those policies in which he had known it to be used.

The plaintiffs further testified, that, on or about August 8, 1882, they received the following telegram from the· captain of the schooner: "S. W. Harbor, Maine, Aug. 9, 1882. Sch. Madame Roland run ashore Black Island, near Mount Desert, three o'clock this A. M. Total loss. Send instructions;" — that they immediately handed this telegram to Steele, and told .him that they considered the vessel as abandoned and on his hands; that Steele thereupon asked leave to append their names to a telegram to the master, and they assented; that they never took charge of the vessel again, gave no further orders respecting her, and did not of their own knowledge know what was done with her, though they had since seen her at Gloucester.

The plaintiffs called one Margeson, who testified that he was sent to Black Island by Steele to bring the vessel to Gloucester;

that he found her on the rocks, bilged, with her cabin and forecastle partially washed away; that on his arrival at the vessel some things had been taken out of her and put on the island, namely, some cable, and some of the sails, blocks, and rigging of the vessel; that there were some other articles on shore, but he could not remember what, except that there was a broken stove, and possibly a firkin and some tin pans, but they were of no value; that the fish taken during the trip were also on shore in a damaged condition, but he could not remember how many fish there were, nor how much they were damaged; that he chartered a small vessel to take the cable, sails, and rigging, and the other articles taken from the vessel, and the fish, to Bass Harbor, where he sold the fish by auction, and accounted for the money to the Gloucester Insurance Company; that he could not tell the exact amount received by him, but that his recollection was that the fish sold for only about enough to pay the freight from Black Island to Bass Harbor; that the schooner was afterwards got off and brought to Bass Harbor, where the sails, cable, rigging, and other articles were put on board, and taken in her to Gloucester; that, on arrival there, the cable, sails, rigging, and other articles, were put into the plaintiffs' warehouse at the request of Steele, where they remained until delivered upon the order of the Gloucester Insurance Company.

The plaintiffs also called Peter Manning, one of the crew of the schooner on this trip, who testified that, before she ran ashore, the captain had put into Shelburne, Nova Scotia, and bought 18,000 herring there, but that nothing had been put ashore from the schooner at that place; that up to the time she ran ashore they had taken from ten to fifteen thousand pounds of fish, all of which were saved in a damaged condition.

The plaintiffs testified, that a fair price for the herring bought for bait, at that time, was fifty cents a hundred; that the fish on board were worth from $3 to $3.50 a hundred pounds; that they had never received any money on account of them, and did not know of their own knowledge what was done with them or with any money received for them; that they did not know where the captain was, but thought he had sailed from Gloucester since then; that, since the loss of the schooner, one of them had never seen him at all, and the other only once, and

then not to speak with him; and that they had never asked him for any account of the fish or any money received for them, or about anything saved from the vessel. They also testified that on September 7, 1882, they delivered to Steele a letter signed by them, of which the following is a copy: " Gloucester, Mass., Sept. 7, 1882. To the President and Directors of the Gloucester Mutual Fishing Insurance Company: Gentlemen, We hereby give you notice, that we abandon to your office the sch. Madame Roland, insured under your policy No. 187;" and also at the same time another letter exactly like this, except as to the number of the policy referred to, and except that it was addressed to Steele as agent of the Boston Marine Insurance Company.

The above was in substance all the evidence introduced by the plaintiffs. The defendant introduced no evidence, but asked the judge to rule that, upon the evidence above reported, or so much of it as is lawfully admissible, the plaintiffs could recover nothing in this action. The judge refused so to rule, but ruled that the plaintiffs could not recover under this policy for loss of outfits, but that they might recover only for the amount of advances to crew ($60.14), and the amount furnished the captain to buy bait ($100); that these two interests were covered by the policy, and that there was evidence which would justify the jury in finding that they were totally lost. To these rulings the plaintiffs and the defendant excepted. A verdict was then taken for the plaintiffs by consent, under these rulings, for $160.14, with interest from the date of the writ.

If these rulings were right as to the amount advanced the crew, or as to the amount furnished to buy bait, or as to both, judgment was to be entered for $60.14, or for $100, or for $160.14, accordingly, with interest from the date of the writ, provided that the ruling as to outfits was also right. If the last-mentioned ruling was wrong, there was to be a new trial.

*B. N. Johnson & G. B. Ives*, for the plaintiffs.

*F. Dodge*, for the defendant.

FIELD, J. The statements made by Steele, before the policy was issued, that he could " write $500 more in the Boston Marine Insurance Company," and could " call it advances," and not " outfits," and that it would be " all right," could not be received to change the contract actually made. A written contract must

be construed according to its terms in their ordinary significa-
tion, unless those terms, by usage in the business or between
the parties, have a different meaning; and oral evidence that,
before the contract was executed, the parties orally agreed that
some of its terms should mean something different from their
ordinary meaning, or their meaning as established by usage, is
evidence to vary a written contract.   Usage is a fact; and, if
it is a particular usage, it must be known to the parties, and, if
a general usage, it must be so well established and known that
it must be considered that parties reasonably well acquainted
with the trade or business either knew it, or ought to have
known it.

The testimony of Gore is not testimony that what is usually
described in policies of insurance as "outfits" had been actually
insured as "advances" in policies generally, or in policies on
fishing-vessels in Gloucester.   Indeed, his testimony is that "ad-
vances," in policies of insurance, commonly means advances to
the crew and advances on account of freight.   The only portion
of his testimony favorable to the claim of the plaintiffs is an
expression of an opinion of what might properly be done, and
not testimony of anything that had actually been done, or of
any existing usage.

The advances claimed are $60.14, which had been advanced
to different members of the crew, to be repaid by them out of
their shares of the catch, and $100, which had been advanced
to the captain to buy bait.   Neither the captain nor the crew
received wages, "but took shares of the catch instead."   It is
not contended that the advances to the crew were not covered
by the policy, if the evidence showed a total loss.   For the ad-
vances to the crew, the plaintiffs had a lien upon their share of
the catch.   The plaintiffs also had a lien upon the catch for
any money expended for bait.   If the plaintiffs delivered money
to the captain to be expended for bait, and he did not so ex-
pend it, it would seem that the captain became personally in-
debted to the plaintiffs for it, and that the plaintiffs would have
no lien on the catch for the payment of this debt; and that it
would not be covered by the policy.   *Minturn* v. *Warren Ins.
Co.* 2 Allen, 86.   So far, however, as the money was expended
for bait, it was an advance on account of the catch, for the

payment of which the plaintiffs had a lien on the catch, and was covered by the policy. There was evidence from which the jury could properly find that $90 had been expended for bait.

The defendant denies that there was a total loss of the catch out of which the advances were payable. The policy was "free from claim for particular and (or) general average;" and the plaintiffs must show either an actual total loss of the catch, or a constructive total loss followed by an abandonment. *Heebner* v. *Eagle Ins. Co.* 10 Gray, 131. *Greene* v. *Pacific Ins. Co.* 9 Allen, 217.

The defendant asked no instructions upon the distinction between an actual total loss and a constructive total loss; but merely asked the judge to rule that, on the evidence, the plaintiff could not recover. The judge ruled that there was evidence which would justify the jury in finding that the advances were totally lost. We take this to mean totally lost within the meaning of the policy; and as, in this Commonwealth, such a policy is held to cover a constructive total loss where there is an abandonment, as well as an actual total loss, if, on the evidence, the jury were warranted in finding either, the exceptions cannot be sustained. We think there was sufficient evidence of a constructive total loss of the schooner, outfits, and catch, and of an abandonment to Steele, and of an acceptance of it by him. The Gloucester Mutual Fishing Insurance Company, of which Steele was president, had insured the schooner and "outfits, catch, cargo, or the freight on said cargo." Steele was also "the local agent of the defendant at Gloucester, having authority to take risks and countersign and issue policies, which were furnished him by the defendant, signed by its president and secretary." The defendant's policy is "on advances on board the schooner Madame Roland." A constructive total loss of the catch would be a constructive total loss of the advances, which were a lien on the catch. At the same time that the plaintiffs delivered to Steele written notice that they abandoned the schooner Madame Roland to the Gloucester Company, they also delivered to him, as agent of the defendant company, written notice that they abandoned the schooner to the defendant, as insured under the policy, the number of which they gave. The plaintiffs had previously orally abandoned the vessel to Steele,

and informed him of the grounds of abandonment, and he had sent a man to take charge of her.

We think it is too narrow a construction of this notice to the defendant to hold that it was merely an abandonment of the schooner. The defendant had not insured the schooner, but "advances on board the schooner;" the notice refers to the policy, and reasonably gives notice that the plaintiffs abandoned whatever was on board the schooner to which the policy attached. *Macy* v. *Whaling Ins. Co.* 9 Met. 354.

Whether Steele had authority to accept an abandonment on behalf of the defendant is immaterial, if there was actually a constructive total loss, and the plaintiffs gave proper notice of abandonment. The defendant offered no testimony. If Steele was a proper person to receive notice of an abandonment on behalf of the defendant, or if the defendant received the notice delivered to him as its agent, and was informed of the grounds of abandonment, it was a good abandonment; and we cannot say that it was not competent for the jury, on the evidence, to find either of these facts.

If the defendant insists upon a new trial, in order to determine what part of the $100 was actually expended for bait, the exceptions must be sustained, and a new trial granted upon damages only; otherwise, if the plaintiffs will remit from the verdict $10, with interest thereon from the date of the writ, there may be                              *Judgment on the verdict.*