### Bank of Commerce v. George S. Miller.

1. BANKS AND BANKING—*Custom Will Not Excuse a Collecting Bank from Exercising All Reasonable Diligence.*—No general custom will excuse a collecting bank from exercising all reasonable diligence in collecting a check, and a special usage will have no greater effect in excusing the bank, than will a general custom.

2. SAME—*Particular Custom of Bank Must Be Known to Customer to Be Binding upon Him.*—A particular custom, in order to be binding on a customer sending a draft for collection, under the circumstances of this case, must have been actually known to him when he sent it.

3. RATIFICATION—*Made Only upon Full Knowledge of the Material Facts.*—Ratification is not made save with full knowledge of all material facts; the ratification of the principal in ignorance of them is no defense to the agent.

4. USAGE—*How it Must Be Established.*—Usage is a fact, and if it is a particular usage, it must be known to the parties, and if a general usage, it must be so well established and known, that it must be considered that parties reasonably well acquainted with the business either knew it or ought to have known it.

**Trespass on the Case.**—Damages for negligence of bank in collecting a draft. Appeal from the Circuit Court of Cook County; the Hon. RICHARD W. CLIFFORD, Judge presiding. Heard in the Branch Appellate Court at the October term, 1901. Affirmed. Opinion filed December 30, 1902.

Appellee, in 1895, resided at Monee, Illinois, about thirty-four miles from Chicago, where he conducted for some years prior thereto, a general store and grain elevator business. During all this time he had been doing business with Tim-

berlake & Company, and their predecessors, commission merchants, with offices at 501 Royal Insurance Building, in Chicago, selling them corn. During this period he was a depositor with the appellant, Bank of Commerce.

It was the custom of the appellee from time to time to draw sight drafts upon Timberlake & Company, and send them with other items to the Bank of Commerce for deposit and collection. He had no bank deposit or pass-book and it does not appear that he knew the rules and method employed by the bank for the collection of the items which he forwarded.

On Wednesday, July 3, 1895, Timberlake & Company were indebted to appellee in the sum of $1,800 and upwards, and in the evening of that day he made out a deposit statement, including a number of small checks and a sight draft for $1,000 upon Timberlake & Company, signed by him and made payable to the order of the Bank of Commerce. July 4, 1895, was a holiday, and on the morning of July 5th, he mailed the letter inclosing the items for deposit with the draft. The draft was received by the bank at 2:30 P. M. on Friday, the fifth day of July, 1895. It was immediately entered for collection, and a postal card dated July 5, 1895, was made out stating that the bank had received and credited the $1,000 draft, but was not mailed to appellee until the evening of Saturday the sixth and was received Monday, July 8th.

The bank presented the draft to Timberlake & Company by messenger, about eleven o'clock of Saturday, July 6, 1895, and their check for $1,000 on the National Bank of the Republic, payable to the order of the Bank of Commerce, was received and the draft was stamped "Bank of Commerce, paid," and delivered to Timberlake & Company. It was about two blocks from the Bank of Commerce to the office of Timberlake & Company and about one-half block from the Bank of Commerce to the National Bank of the Republic.

The Bank of Commerce did not present this check for payment or certification to the National Bank of the Republic

on Saturday, and on Monday the eighth, presented it for collection through the clearing house, and it reached the National Bank of the Republic between eleven and twelve o'clock on Monday, July 8th, (along with other checks which in the aggregate exceeded the entire amount to the credit of Timberlake & Company), and payment was refused.

The account of Timberlake & Company was good for the amount of the check on Saturday, and the check would have been certified and paid if presented when the bank opened on July 8th, but about eleven o'clock the National Bank of the Republic credited the entire balance of the Timberlake & Company account upon demand notes which it held, and refused to pay further checks, and at noon on Monday, Timberlake & Company failed, and have since remained insolvent.

On the afternoon of Monday, July 8th, the bank wired appellee " Timberlake draft not good." This telegram was received late in the afternoon, and next morning appellee came to Chicago on an early train, was introduced to the attorneys of the bank and with their assistance started an attachment suit against Timberlake & Company for the entire amount of his claim, including $1,000.

On his return home on the evening of Tuesday, July 9th, after starting the attachment suit, he was advised by letter and telegram which he found awaiting him, that the bank, appellant, had received a check and that it presented the check at the office of Timberlake & Company immediately after the refusal to pay by the National Bank of the Republic, and that the cashier of Timberlake & Company stated that Timberlake had gone home sick and that the matter would be all right in the morning, and that it would present the check at the bank again on the morning of the next day (Wednesday).

July 11, 1895, the appellee sent to appellant the following letter :

" MONEE, ILL., July 11, 1895.

BANK OF COMMERCE, CHICAGO, ILLINOIS.

GENTLEMEN : Letters and messages received. On 7-6-'95

I received acknowledgment that Timberlake draft was paid and placed to my credit.  I will hold you responsible for said amount.  I remain,

Yours truly,

GEORGE S. MILLER."

On the 13th day of July, 1895, appellee received through the mail from appellant the said Timberlake check, but returned it to appellant, writing the following:

" It is useless for you to attempt to foist this check of W. M. Timberlake & Co. upon me.  I do not own it and I will not have it, and will return it to you every time you send it to me.  I remain."

Appellee made demand upon appellant about July 15, 1895, for payment of said amount of $1,000 and payment was refused.

FELSENTHAL & FOREMAN, attorneys for appellant.

FRANK F. REED, attorney for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

The draft involved in this case was received from George S. Miller, appellee, of Monee, Illinois, by the Bank of Commerce of Chicago, appellant, through the mail at 2:30 o'clock in the afternoon of Friday, July the fifth, 1895.  It was made payable to appellant, signed by appellee, and drawn on Timberlake & Company, a commission firm of Chicago.  The bank did not present the draft to the drawee until the next day at about eleven o'clock and then received therefor an uncertified check drawn upon the National Bank of the Republic to the order of the bank and signed by Timberlake & Company.

The Bank of Commerce took no steps to collect or have certified, the check on Saturday, but on Monday presented it for collection at the clearing house, and it reached the National Bank of the Republic between eleven and twelve o'clock on Monday, July 8th, where and when payment was refused.  The account of Timberlake & Company was good for the amount of check at National Bank of the Republic, during Saturday, and at ten o'clock, and for some time there-

after, on Monday, July 8th, but about eleven o'clock the National Bank of the Republic appropriated the entire balance of Timberlake & Company to pay certain demand notes, and one hour thereafter Timberlake & Company failed, and have since then remained insolvent.

Appellee recovered judgment in the Circuit Court for the amount of the draft. Appellant bases its request for a reversal of this judgment upon five grounds, first, that it was not guilty of negligence in not presenting for payment the draft on the day of its receipt.

The declaration does not count upon this fact as an act of negligence, but sets up as the cause of loss only the following:

" The defendant, appellant, wholly failed to present said check for payment or certification until long after the hour of 12:30 P. M. on the said 8th day of July, A. D. 1895, until the hour of 2 o'clock P. M. on said day, when the said National Bank of the Republic refused to honor and pay said check, wherefore by reason of the taking of the said check by the said Bank of Commerce instead of legal tender or money payable to said draft and by reason of the failure of the said Bank of Commerce to present the same to the National Bank of the Republic on the said 6th day of July, A. D. 1895, and prior to the hour of 12:30 P. M. on the 8th day of July, 1895, and for no other reason, the actual payment of said draft failed."

The jury was waived and case submitted to court. Certain propositions of law were presented to the court and among others the following, which the court refused to hold:

(10.) " The court is requested to hold as the law in this case that if it was the custom of the defendant bank not to present for payment paper sent to it for collection and received by it in the afternoon of any day, until the morning of the next day, it can not be charged with negligence for presenting such paper so received, on the next day after its receipt."

It will not be presumed that the court found the appellant guilty of any act of negligence not charged in the declaration; and even though in a proper case the instruction might be held correct, however under the pleadings

and evidence in this case, we do not consider it reversible error to have refused to mark said instruction "Held."

Negligence does not depend alone upon a custom, whether proved or unproved, of the bank; and without taking into consideration other questions, such as the relation of the parties, knowledge of the custom, etc., the record does not disclose that the court made, and we are satisfied that the court did not make his findings upon the theory suggested by this objection; because the court, in propositions of law presented by appellant, numbered 1, 2, 3 and 5, held, very favorably for appellee, and as law, the substance of proposition number 10.

Second. The second and third grounds of appellant will be considered together and they are: Appellant did not act improperly in taking a check for the draft instead of money, and appellant exercised due diligence in presenting the check for payment through the clearing house. The draft was presented to Timberlake & Company on the forenoon of Saturday and an uncertified check of Timberlake & Company taken therefor, and no attempt made to collect or have the same certified, except by presenting the check for collection through the clearing house on Monday. Appellant attempted to show that it acted in accordance with the general custom of banks, but if not, at least in accordance with its own particular custom.

Appellant most signally failed in its contention that in failing to present the check in question for collection or certification on Saturday, it acted in accordance with the general custom of banks. To sustain appellant's contention in this regard, A. H. Mauerman and Miller testified, the one that the only knowledge on the subject he had was from hearsay, and Miller testified that it was the custom of appellant to hold checks received for collection by late mail until next day, but that he was not familiar with the custom of outside banks. On the other hand, to prove that it was contrary to the general custom of banks in Chicago to accept a check in payment for a draft received from an outside depositor and hold the same without at once collect-

ing or having it certified until the Monday following, the officers of several of the largest banks of Chicago testified as follows: John A. Moulton, vice-president of the Corn Exchange National Bank of Chicago, in answer to a question as to whether it was the general custom of the Chicago banks to accept checks uncertified, as was done in this case, stated that it was not the custom, but was the general custom to collect the money or its equivalent, and that "if we failed to do it, if we take anything but the money, we do it at our own risk."

It may be, as the counsel suggests, that the latter part of this statement is a conclusion of the banker, but if it is a conclusion, it only makes more certain his understanding and statement of the custom of the banks, including the Corn Exchange Bank.

P. K. Gordon, of the First National Bank of Chicago, testified that he was familiar with the customs and usages in 1895, with reference to the collection of drafts in the city of Chicago, and that in 1895 it was not the general custom on the part of banks to take uncertified checks in payment for drafts and surrender and mark them paid, but he states that the First National Bank would, in a case of certain board of trade houses, take the checks, have them returned to the bank to some one empowered to look them over, and such officer would immediately upon looking them over send out for certification those the bank did not wish to take chances on.

Chas. C. Reed testified that in 1895 it was the custom among banks, naming the Illinois Trust and Savings Bank, the Commercial Loan and Trust Company Bank, the Royal Trust Company, the Merchants National Bank, and the Union National Bank, that when drafts were to be collected it was customary to instruct messengers to get the checks that they received in payment of $500 and upward, certified before they returned to the bank, and after they returned to the bank an officer was authorized to look over the checks for the small amounts under $500 and determine whether the bank would take the risk, and if any special

checks were found upon which they were not willing to take the risk, they were sent out at once for certification. These witnesses, of large, long and varied experience in the banking business in Chicago, have satisfied us, as they evidently satisfied the careful and experienced judge who tried the case, that the appellant, in holding the check uncertified, did not act in accordance with the general custom of Chicago banks which prevailed in 1895. But appellant insists that even though it failed to act pursuant to the custom of Chicago banks in collecting the check in question, still the general rule followed by bankers 'in collecting for drafts can not be invoked in this case, because it was the usage of appellant to present checks taken under the circumstances in evidence, through the clearing house. Appellant insists that if it was the custom of the appellant bank not to present a check, taken in payment of a draft, directly to the bank upon which it is drawn, but through the clearing house, then surely appellee was bound by such usage and appellant ought not to be charged with negligence. The evidence shows that appellee lived in the country and sent, for collection and deposit, items from his country store and at no time had a deposit book of appellant, and was not aware of the alleged particular custom of appellant in collecting drafts; yet attorney for appellant insists that appellee is conclusively presumed to have known this alleged particular custom of appellant, and refers to Morse on Banks and Banking, and Bolles on Bank Collections; Mills v. The Bank of the United States, 11 Wheaton, 431; Fowler v. Brantley, 14 Peters, 318; Moors v. Goddard, 147 Mass. 287.

Without extending this opinion with a review *in extenso* of the authorities above referred to, we are of opinion that the attorney for appellant has comprehensively, tersely and accurately abstracted these authorities to a complete refutation of his position, when he says : " It is true the foregoing cases and authorities hold that such presentation of a check through a clearing house can not be held to be negligence, if the evidence shows that that was the general custom of

banks." And attorneys further maintain that this doc-
trine by parity of reasoning also extends to a case wherein
the evidence shows that such was the custom of the par-
ticular bank entrusted with the collection of a draft. Mr.
Mauerman states that the custom of the Bank of Com-
merce in regard to these collections was that "We would
accept the check as cash provided the firm was good and
reliable," and thereupon the court very pertinently asks,
"Who was to pass on the solvency of the firm? who was to
determine that—the bank?" And witness replied, "The
bank did."

The witness further stated:

"Not always, but generally, where there was a plain
draft we accepted the check. When we received the sight
drafts for collection at the Bank of Commerce in 1895, we
always sent them for presentation by messenger. If the
messenger did not find the firm in he would leave a notice
to the payee of the draft. When Timberlake & Company
were out and the boy left a notice, then Timberlake &
Company in the afternoon would come around with their
certified check and take up the draft."

The notice left by the messenger stated that the checks
must be certified, so that it is by no means certain that
the appellant had a particular custom of its own in
regard to collecting drafts irrespective of the amounts
for which they were drawn, and if it did have such par-
ticular custom, two things are certain—that such alleged
particular custom was not in accordance with the general
custom that obtained in 1895, among bankers, and if such
particular custom existed, it was entirely unknown to the
appellee. Counsel have quoted at length much law as to
whether the appellant was at fault in surrendering the
draft in question, but as has already been shown, no negli-
gence in this regard is charged, therefore the opinion
quoted at length in the trial before Lord Kenyon has no
bearing upon this case. It may be observed in that case
that the court stated that "We dare not grant a rule, as it
would be putting the whole trade of London in suspense."
In that case there was a general universally recognized
usage and custom.

Bank of Commerce v. Miller.

In Burkhalter v. The Second National Bank, 42 N. Y. 538, it was held that the plaintiffs were bound to demand payment on the first day they received the draft, or the next day, and that they were bound to use reasonble diligence in demanding payment; but in that case it appears that Culver, Penn & Co., who took up the draft and charged it to the drawer, had no funds in the bank upon which they drew their check in payment thereof. On the day plaintiffs received the draft, or the next day, although the bank continued to pay their checks on the day the draft was received, with the expectation that they would make their account good, and laboring under this impression, a second draft was given in payment for the first draft. Defense to payment of this second draft was made on the ground that it was given under a mistake of facts, for the first one, from which it had been discharged. This case was decided by a divided court with a statement that no critical examination of other cases had been made and that the decision would be based on Turner v. Bank, 3 Keyes, 425.

In Smith v. Miller, 43 N. Y. 171, the very significant language is used :

"When a check is taken instead of money, as was done by the plaintiffs, a delay of presentment for a day, or for any time beyond that in which with proper and reasonable diligence it can be presented, is at the peril of the party thus retaining the check and thus postponing presentment, as between him and the persons in interest whom he represents. If a custom can exist in law, and does exist in fact, authorizing such delay at the risk of the absent principal, it must be shown; it can not he presumed to exist without evidence. It was the duty of the defendants to present the check at the bank at least during the day."

In the case of Indig. v. The National City Bank, 80 N. Y. 100, was a holding by nearly an evenly divided court, with reference to a question of agency, where a note was sent by mail to a distant bank, and does not aid in deciding the case at bar. The conclusion to be drawn from these cases and the text books cited by counsel is, that a draft

may be surrendered and a check taken therefor, but all reasonable diligence must be used in presenting such check for collection, and if such diligence be used and the check is not promptly paid or certified, then that the draft may be at once reclaimed. No general custom, if such custom existed, would excuse the collecting bank from exercising all reasonable diligence in collecting such check, and certainly a special usage would have no greater effect in excusing the bank, than would a general custom. National Bank of Commerce v. The Am. Ex. Bank, 151 Mo. 320; Minneapolis v. Metropolitan Bank, 76 Minn. 136; Marine Bank v. Chandler, 27 Ill. 525; Webster v. Granger, 78 Ill. 230.

The alleged particular custom and method of the Bank of Commerce in relation to the presentation of drafts, receipt of checks therefor and retention of same until the following day, contrary to the general custom, was a particular or special custom, and in order to be binding on appellee, under the circumstances of this case, must have been actually known to him when he sent the draft for collection. 27th Am. & Eng. Ency. of Law, article, Usages and Customs and Notes; Strong v. King, 35 Ill. 9; National Bank v. Burkhardt, 100 U. S. 686; Corrigan v. Herrin, 44 Ill. App. 363; Rickerson v. Hartford Ins. Co., 149 N. Y. 307.

In Burnham v. Boston Marine Ins. Co., 139 Mass. 399, it was said:

"Usage is a fact; and if it is a particular usage, it must be known to the parties; and if a general usage, it must be so well established and known, that it must be considered that parties reasonably well acquainted with the business, either knew it or ought to have known it. A usage must not be unreasonable. 1st Blackstone, 77."

In Whitney v. Esson, 99 Mass. 308, 96 Am. Dec. 762, the Supreme Court said:

"The decision of Russell v. Hankey, 6 T. R. 12, was based upon the ordinary usage in London. But in Byles on Bills, (5 Am. Ed.) 24, it is said not to be usual at this day with London bankers, to exchange bills for checks,

Bank of Commerce v. Miller.

and it is doubtful if the bank would now be protected in so doing. In this case it is agreed by the parties that it is a common practice for holders of drafts to accept the check of the drawee in exchange for the draft, though it is not claimed to be a general established usage, and in most cases the standing of the drawers of checks is such that these checks are taken as readily as cash. This may make a common practice among men who are dealing on their own account, but such practice falls short of a usage applying to the collection of drafts for absent parties."

Appellee, in case at bar, was an absent drawer of the draft and unacquainted with the alleged method of doing business in regard to collection of drafts by appellant. It is suggested that appellee lost nothing because of the conduct of appellant in failing promptly to collect the draft or check, but we decline to enter upon the sea of speculation with reference thereto. The record is silent, and we must therefore presume that the drawer of the draft intended its collection with all reasonable and ordinary speed. If the bank has failed so to do, the loss must fall upon the negligent. Appellant claims that even if it was guilty of disobedience of orders, express or implied, still he, appellee, ratified the bank's conduct in regard to the presentation of the draft and check. Appellee did institute a suit against Timberlake & Company as soon as possible, for his claim, including the amount of the draft, with the assistance of the bank, the president thereof signing the bond for attachment proceedings, but at that time appellee did not know of the conduct of the bank in reference to presenting the draft, or that the bank had accepted an uncertified check. So soon as appellee learned of the conduct of the bank with respect to the draft and check, he promptly notified the bank that he would hold it liable for the amount of the draft, and he thereafter discontinued his said suit as to the amount of said draft. The record does not disclose any act of negligence on the part of appellee from which the bank could have suffered. It appears that the said attachment suit was begun by appellee without a knowledge of the facts pertaining to the draft and check, which the bank ought to have communicated to him.

Ratification is not made save with full knowledge of all material facts, and if the agent keeps back or suppresses any such facts, the ratification of the principal in ignorance of them is no defense to the agent. Mechem on Agency, 173, and authorities there cited.

Finally, attorney for appellant pleads that if the bank was chargeable with negligence, nominal damages only should be assessed. It must be conceded that if the bank was negligent, as charged in the declaration, the evidence shows that the full amount of the draft could have been collected on Friday and Saturday and at the opening of the National Bank of the Republic on Monday. We therefore can not say that the amount of the judgment is too large.

The judgment of the Circuit Court is affirmed.